IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GREATER HOUSTON TRANSPORTATION COMPANY, FIESTA CAB COMPANY, HOUSTON TRANSPORTATION SERVICES, LLC, NATIONAL CAB CO., INC., PASADENA TAXI CO., INC.,  AMERICAN MEMENTUM GROUP LLC, ATLAS LIMOUSINE LLC, CTI TRANSPORTATION, LLC, LIBAN INCORPORATED, AVANTI INT'L TRANSPORTATION, LTD., FIRST PRIORITY TRANSPORTATION, LLC., LONE STAR EXECUTIVE LIMOUSINE, LLC., DAWIT SAHLE, MOHAMED SAMATER, MERSHA AYELE, MOSES A. TESFAY, MELAKU SHUMIE, ABRAHAM TARKEGNE, KIDANE GHEBRESLASSIE, MOHAMED DIDI, CHAMPION CAB CO.,  GREATER SAN ANTONIO TRANSPORTATION COMPANY, ENTERPRISE TRANSPORTATION INC. | § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO.: 14-941 |
| v. | § § § | |
| UBER TECHNOLOGIES, INC. and LYFT INC. | § § | |

**PLAINTIFFS' ORIGINAL COMPLAINT and APPLICATION FOR TRO, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COME NOW, Plaintiffs as identified below, and file this Original Complaint and Application for TRO, Preliminary Injunction, and Permanent Injunction against Uber Technologies, Inc. and Lyft, Inc.

Executive Summary

1.      Plaintiffs consist of the majority of the taxicab permit holders licensed under Chapter 46 of the City of Houston Code of Ordinances Vehicles for Hire, and a substantial portion of the taxicab permit holders licensed under Chapter 33 of the City of San Antonio Ordinances (cumulatively, "Licensed Taxi Operators"); Plaintiffs also

1

consist of a substantial portion of the chauffeured limousine services licensed under Chapter 46 of the City of Houston Code of Ordinances Vehicle for Hire ("Licensed Limo Operators"). Defendants Uber and Lyft are operating "for hire" vehicles in Houston, Texas as defined under Section 46-1 "For hire"; yet are doing so without obtaining licenses, without paying license fees, without proper insurance, without charging the regulated rates, surcharging as they choose, and without following the other extensive obligations that Chapter 46 imposes on all "For hire" vehicle operators doing business in Houston, Texas. In addition to the legal requirement that operators and vehicles must be licensed to provide transportation originating from within Houston, City Ordinance Section 46-11.1 makes mobile dispatch services such as Uber and Lyft responsible for code compliance by their drivers and vehicles, and further requires that such services register with the director and provide and maintain accurate records of all permittees and licensees providing vehicle for hire transportation services. Plaintiffs have suffered and will suffer substantial and irreparable harm from the unlicensed operations of Uber and Lyft.

2.      Despite full knowledge that Uber and Lyft's vehicle "for hire" operations require City of Houston issued licenses, Uber and Lyft have proceeded to intentionally and repeatedly defy the law. As a status report to Mayor Anise Parker and Houston City Council Members, Tina Paez, Director Administration & Regulatory Affairs Department ("ARA") issued a letter[1] dated April 2, 2014 informing the City that the:

> ARA is responsible for the enforcement of drivers and companies as prescribed by Chapter 46 . . . and that ARA investigators have issued 26 citations to date. . . .; [and that] Uber and Lyft were issued citations under Sec. 46-11.1 for failure to register as a mobile dispatch service.

3.      The calculated and intentional effort by Uber and Lyft to repeatedly ignore applicable laws is further evidenced by the commencement first of Lyft, and later by Uber of their operations in San Antonio, which have been conducted in flagrant violation

---

[1] *See Spears Ex. A* (Paez Letter).

of known legal obligations, summarized in a cease and desist letter[2] issued by the City of San Antonio Police Department, William P. McManus, Chief of Police, dated March 26, 2014, which stated in part:

> Again, this letter is written as notification to immediately cease and desist your current and future operations that are intended to dispatch vehicles-for-hire within the City of San Antonio's right-of-way without securing the proper authority. Operating an unpermitted vehicle for hire without prior authorization is a criminal offense.

4. Lest this Court wonder why Plaintiffs have sought the requested relief in light of such clear declarations by City authorities in Houston and San Antonio that such unlicensed operations are illegal, subject to citations, and a cease and desist letter, Lyft and Uber have ignored such warnings and have continued their operations, as discussed further below. Their continued violations are not inadvertent. Paige Thelen, Lyft spokeswoman, has been quoted as saying:

> Lyft is working with drivers to cover the cost of citations and legal assistance [and Lyft has] been in constant communication with drivers to let them know that we''ll support them every step of the way . . . . [3]

5. Lyft has simply borrowed from Uber's flagrant disregard for the rule of law, with the expectation of enforcement impotence articulated by the Co-Founder and principal of Uber, Travis Kalanick, as follows:

> The thing is, a cease and desist is something that says, 'Hey, I think you should stop,' and we're saying, 'We don't think we should.' The only way to deal with that is to be taken to court, and we never went to court.[4]

6. Their declarations as well as their deeds necessitate this Court's intervention to prevent the immediate and irreparable harm to Plaintiffs. As indicated above, the Licensed Taxi Operators are facing unfair competition and skimming of profitable trips by the unlicensed taxi service operators Lyft and Uber. Without swift

---

[2] *See Bouloubasis Affidavit Ex. B (Cease & Desist Letter).*
[3] *See Spears Ex. C.*
[4] *See Spears Ex. B.*

action by this Court, the currently Licensed Taxi Operators and their drivers who lose profitable trips to Uber/Lyft's unlicensed taxi operators will by choice or by necessity begin to ignore the licensing fees and related requirements, or otherwise face extinction in the marketplace.

7.      If illegal and unlicensed transportation providers can operate outside the law, why would any "For hire" vehicle operator obtain and pay substantial "For hire" license fees, charge the fare rates set by the City of Houston, file insurance/financial responsibility documentation with the City as required by City Ordinance, transport seniors at or over age 60 at a discounted fare as required by the City of Houston, provide and transport the disabled in wheelchair accessible taxis and/or otherwise comply with disability sensitivity training per applicable ordinances, operate 24/7 throughout the City and not just in profitable "hot spots", accept short unprofitable trips to the local grocery store, or otherwise comply with transportation system promulgated under Chapter 46?  They wouldn't, and, long-term, they could not sustain a system whereby one group pays license fees and taxes, and fulfills Chapter 46's obligations in the public interest as determined by local government, while a different group ignores all such obligations and simply skims the profitable trips to the detriment of the Licensed Taxi Operators.

8.      So too, the Licensed Limo Operators have followed their respective ordinances in serving a more upscale clientele under Chapter 46; and have refrained from providing on-demand taxi services in violation of Chapter 46's demarcation between the Limo/Sedan business and the taxicab business.  If Chapter 46's regulatory demarcation is destroyed by illegal and unlicensed operators simply focusing on the profitable trips, avoiding unprofitable trips, and ignoring all of the other obligations set forth in Chapter 46 as explained more fully below, the Plaintiff Licensed Limo Operators will face a similar rush by drivers and unsavory operators to similarly perform any profitable trips, ignoring all other legal requirements.  Why pay for a license if it means

4

nothing?  Why respect the obligations under Chapter 46?  Defendants' ignoring of the law will cause inherent and irreparable damage to the Licensed Taxi Operators, as well as the Licensed Limo Operators – which is evidenced by the wide range of plaintiffs participating in this lawsuit.

9.      In summary, the City of Houston has promulgated Chapter 46 and the City of San Antonio has promulgated Chapter 33 of their respective Codes of Ordinances to reflect requirements under Texas law.  More specifically, Section 215.004(a) of the Texas Local Government Code mandates that "[t]o protect the public health, safety, and welfare" municipalities shall license, control and regulate taxicab transportation for compensation, and municipalities "may" license, control, and otherwise regulate limousine transportation services.  The respective ordinances recognize that both types of service (taxi and limousine) must work in conjunction with, but be distinct from one another.  Additionally, those ordinances protect the "public health, safety, and welfare" of all citizens, jurisdiction wide, without discrimination, defined very broadly to include those with disabilities, discounts for seniors, and other public policy determinations made by elected officials in conformance with Texas law.  Uber and Lyft have supplanted local government's public policy decisions by skimming only the profitable trips from the percentage of the population who have credit cards, and ignoring the greater community obligations reflected in Chapter 46 and Chapter 33, respectively.  Plaintiffs will be immediately and irreparably harmed from Uber and Lyft's blatant circumvention of license, tax and compliance obligations under applicable ordinances.

10.     As part of the obligation to reflect the "public health, safety and welfare" of its citizens, City issued "for hire" licenses act as the first line of protection against unsavory operators and unsafe transportation.  Even if Lyft and Uber had perfect safety procedures, insurance and responsibility for their operations (much disputed below), opening the door to "want a be" competitors who can operate in an environment without licensing obligations and other responsibilities invites chaos.

11.     As just one example, City Ordinances require that proof of financial responsibility/insurance be filed with the City. Absent adherence to licensing requirements, the City must chase unlicensed perpetrators to hope to discover their insurance, if any.   Uber and Lyft have both avoided filing of any insurance documentation with either San Antonio or Houston, and their policies have serious gaps as indicated by the insurance expert reports referenced below.   While Lyft's actual insurance carrier, if any, is unknown; Uber's insurer, James River Company, is not listed as an "authorized" insurer in the State of Texas as required by the City of Houston in order to provide "for hire" insurance within the City of Houston.   The relevance of such insurance is somewhat mooted by Uber and Lyft's disclaimers of any responsibility whatsoever for their actions (contrary to their marketing campaign), with the following broad disclaimers (plus others more fully discussed below):

Uber:[5]

> THE COMPANY MAY INTRODUCE YOU TO THIRD PARTY TRANSPORTATION PROVIDERS FOR THE PURPOSES OF PROVIDING TRANSPORTATION. WE WILL NOT ASSESS THE SUITABILITY, LEGALITY OR ABILITY OF ANY THIRD PARTY TRANSPORTATION PROVIDERS AND YOU EXPRESSLY WAIVE AND RELEASE THE COMPANY FROM ANY AND ALL ANY LIABILITY, CLAIMS OR DAMAGES ARISING FROM OR IN ANY WAY RELATED TO THE THIRD PARTY TRANSPORTATION PROVIDER. YOU

Lyft:[6]

> Lyft has no responsibility whatsoever for the actions or conduct of drivers or

---

[5] *See Spears Exhibit E* (Uber Terms of Service).
[6] *See Spears Exhibit H* (Lyft Terms of Service).

6

riders. Lyft has no obligation to intervene in or be involved in any way in disputes that may arise between drivers, riders, or third parties. Responsibility for the decisions you make regarding providing or accepting transportation rest solely with You. It is each rider and driver's responsibility to take reasonable precautions in all actions and interactions with any party they may interact with through use of the services. Lyft may but has no responsibility to screen or otherwise evaluate potential riders or users. Users understand and accept that Lyft has no control over the identity or actions of the riders and drivers, and Lyft requests that users exercise caution and good judgment when using the services. Drivers and riders use the services at their own risk.

12.     In stark contrast to the legal disclaimers by Uber and Lyft, buried in the fine print of their iPhone consummated contract, the Plaintiff Licensed Taxi Operators and Licensed Limo Operators have many responsibilities under applicable ordinances; and they abide by those ordinances.  They are happy to compete on a level playing field, but Uber and Lyft skim the profitable trips, avoid licensing and related fees, avoid ad valorem property taxes, ignore community obligations under Chapters 46 and 33, respectively, and then contractually disclaim responsibility for their wrongful actions. Plaintiffs have been damaged and will continue to suffer immediate and irreparable damages if such illegal conduct is not prevented, and both Defendants have demonstrated an intention to repeat their wrongful conduct, and ignore City issued cease and desist letters.   Their conduct justifies and fully warrants this judicial enforcement of existing laws.

I. Parties

13.     Plaintiff Greater Houston Transportation Company ("GHTC") is a Texas Corporation with its principal place of business at 1406 Hays Street, Houston, Texas 77009, within the boundaries of the Southern District of Texas.  GHTC operates within the greater Houston area as: A Luxury United, Greater Houston Airport Taxi, Towne Car, United Cab, and Yellow Cab.  GHTC presently owns approximately 1,287 taxicab permits issued by the City of Houston.

14.     Plaintiff Fiesta Cab Company ("Taxis Fiesta") is a Texas Corporation with its principal place of business at 1406 Hays Street, Houston, Texas 77009, within the boundaries of the Southern District of Texas.  Fiesta operates within the greater Houston area as Taxis Fiesta and as Fiesta Cab.  Fiesta presently owns approximately 159 taxicab permits issued by the City of Houston.

15.     Plaintiff Houston Transportation Services, LLC ("HTS") is a Texas limited liability company with its principal place of business at 5825 Kelley Street, Houston, TX 77026, within the boundaries of the Southern District of Texas.  HTS operates within the greater Houston area as Lone Star Cab, Liberty Cab, and Square Deal Cab.  HTS presently owns approximately 404 taxicab permits issued by the City of Houston.

16.     Plaintiff National Cab Co., Inc.  ("National") is a Texas Corporation with its principal place of business at 1005 St. Emanuel #7, Houston, TX 77003, within the boundaries of the Southern District of Texas.  National presently owns approximately 46 taxicab permits issued by the City of Houston.

17.     Plaintiff Pasadena Taxi Co., Inc.  ("Pasadena") is a Texas Corporation with its principal place of business at 311 W. Shaw, Pasadena, TX 77506, within the boundaries of the Southern District of Texas.  Pasadena operates within the greater Houston area as Pasadena Taxi.  Pasadena presently owns approximately 16 taxicab permits issued by the City of Houston.

18.     Plaintiff American Mementum Group LLC ("AMG") is a Texas limited liability company with its principal place of business at 2930 La Estancia Ln., Houston,

Texas 77093, within the boundaries of the Southern District of Texas. AMG operates within the greater Houston area as Transgates Limousine. AMG presently owns approximately 5 chauffeured limousine service permits issued by the City of Houston.

19.     Plaintiff Atlas Limousine LLC ("AL") is a Texas limited liability company with its principal place of business at 4618 Park, Bellaire, Texas 77401, within the boundaries of the Southern District of Texas. AL operates within the greater Houston area as Atlas Limousines. AL presently owns approximately 4 chauffeured limousine service permits issued by the City of Houston.

20.     Plaintiff CTI Transportation, LLC ("CTI") is a Texas limited liability company with its mailing address at PO Box 1449. Bellaire, TX 77402, within the boundaries of the Southern District of Texas. CTI operates within the greater Houston area as Corporate Transportation International. CTI presently owns approximately 1 chauffeured limousine services permit issued by the City of Houston.

21.     Plaintiff Liban Incorporated ("LI") is a Texas corporation with its principal place of business at 8339 Hammerly Blvd, Houston, Texas 77055, within the boundaries of the Southern District of Texas. LI operates within the greater Houston area as LaBresse Limousine, and LaBresse Luxury Limousine Service. LI presently owns approximately 15 chauffeured limousine services permits issued by the City of Houston.

22.     Plaintiff Avanti Int'l Transportation, LTD. ("AIT") is a Texas limited partnership with its principal place of business at 1617 Ojeman Road, Houston, Texas 77055, within the boundaries of the Southern District of Texas. AIT operates within the greater Houston area as Avanti Transportation. AIT presently owns chauffeured limousine service permit(s) issued by the City of Houston.

23.     Plaintiff First Priority Transportation, LLC. ("FPT") is a Texas limited liability company with its principal place of business at 634 W Parker Rd., Houston, Texas 77091, within the boundaries of the Southern District of Texas. FPT operates

within the greater Houston area as Merlo's Tours and Transportation, Merlo's Limousines and Charters, and First Priority Limousines.   FPT presently owns approximately 8 chauffeured limousine service permits and 12 charter and sightseeing service permits issued by the City of Houston.

24.    Plaintiff Lone Star Executive Limousine, LLC. ("LSEL") is a Texas limited liability company with its principal place of business at 1 Financial Plaza, Suite 425, Huntsville, Texas 77340, within the boundaries of the Southern District of Texas.  LSEL operates within the greater Houston area as Lone Star Executive Limousine, and Lone Star Executive Limo.   LSEL presently owns approximately 5 chauffeured limousine service permits issued by the City of Houston.

25.    Plaintiff Dawit Sahle ("DS") is a Texas sole proprietor with his principal place of business at 13114 Stratford Skies Lane, Houston, TX 77072, within the boundaries of the Southern District of Texas.  DS operates within the greater Houston area as Adulis Cab Co. and as Adulis Cab.  DS presently owns approximately 8 taxicab permits issued by the City of Houston.

26.    Plaintiff Mohamed Samater ("MS") is a Texas sole proprietor with his principal place of business at 3735 Windmill Village Dr., Houston, TX 77082, within the boundaries of the Southern District of Texas.  MS operates within the greater Houston area as American Cab Co. MS presently owns approximately 4 taxicab permits issued by the City of Houston.

27.    Plaintiff Mersha Ayele ("MA") is a Texas sole proprietor with his principal place of business at 9410 Heflin Colony, Sugarland, TX 77498, within the boundaries of the Southern District of Texas.  MA operates within the greater Houston area as Bell Cab and as Bell Town Car.  MA presently owns approximately 3 taxicab permits issued by the City of Houston.

28.    Plaintiff Moses A. Tesfay ("JWAM") is a Texas sole proprietor with his principal place of business at 16303 Pebble Crest Lane, Houston, TX 77083, within the

boundaries of the Southern District of Texas.   JWAM operates within the greater Houston area as JWAM.  JWAM presently owns approximately 1 taxicab permit issued by the City of Houston.

29.    Plaintiff Melaku Shumie ("Menna") is a Texas sole proprietor with his principal place of business at 10123 Glengate, Houston, TX 77036, within the boundaries of the Southern District of Texas.   Menna operates within the greater Houston area as Menna Cab. Menna presently owns approximately 8 taxicab permits issued by the City of Houston.

30.    Plaintiff Abraham Tarkegne ("AT") is a Texas sole proprietor with his principal place of business at 9809 Richmond, #F13, Houston, TX 77042, within the boundaries of the Southern District of Texas.  AT operates within the greater Houston area as Meski Cab Company.   AT presently owns approximately 3 taxicab permits issued by the City of Houston.

31.    Plaintiff Kidane Ghebreslassie ("Asmara") is a Texas sole proprietor with his principal place of business at 3214 Chalfont Drive, Houston, TX 77066, within the boundaries of the Southern District of Texas.   Asmara operates within the greater Houston area as Asmara Cab and as Asmara.  Asmara presently owns approximately 8 taxicab permits issued by the City of Houston.

32.    Plaintiff Mohamed Didi ("Shirdoon") is a Texas sole proprietor with his principal place of business at 14101 Rio Bonito, #278, Houston, TX 77083, within the boundaries of the Southern District of Texas.   Shirdoon operates within the greater Houston area as Shirdoon Cab. Shirdoon presently owns approximately 7 taxicab permits issued by the City of Houston.

33.    Plaintiff Champion Cab Co.  ("Champion") is a Texas Corporation with its principal place of business at 2646 South Loop West, #250, Houston, TX 77054, within the boundaries of the Southern District of Texas.  Champion operates within the greater

Houston area as Champion Cab.  Champion presently owns approximately 7 taxicab permits issued by the City of Houston.

34.     Plaintiff Greater San Antonio Transportation Company ("GSATC") is a Texas Corporation with its principal place of business at 9600 IH 35 North, San Antonio, Texas 78233.  GSATC operates within the greater San Antonio  area as: Yellow Cab. GSATC presently owns approximately 539 taxicab permits and 30 town car services permits issued by the City of San Antonio.

35.     Plaintiff Enterprise Transportation Inc. ("AAA") is a Texas Corporation with its principal place of business at 513 Paseo Canada St., San Antonio, Texas 78232. GSATC operates within the greater San Antonio  area as: AAA Taxi.  AAA presently owns approximately 42 taxicab permits issued by the City of San Antonio.

36.     The 23 above named plaintiffs shall hereafter cumulatively be referenced as the "Plaintiffs".  Collectively, the Plaintiffs hold approximately 1,961 taxi licenses in the City of Houston and 581 in the City of San Antonio, 39 limo licenses in Houston, 30 town car permits in San Antonio, and 12 sightseeing permits in Houston.

37.     Defendant, Uber Technologies, Inc. ("Uber") is a foreign corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.  Uber may be served with process via its registered agent: National Registered Agents, Inc., 1999 Bryan St., Suite 900, Dallas, Texas 75201.

38.     Defendant Lyft Inc. ("Lyft") (Lyft and Uber hereafter referenced cumulatively as "Defendants") is a foreign corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.  Lyft may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained an agent for service of process, and this suit arose from its business in Texas.

12

## II.  Jurisdiction and Venue

39.     The District Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, since there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.   Additionally, this Court has Federal Question jurisdiction under 28 U.S.C. §1331 since this matter includes allegations related to Federal statutes.   Specifically, the court has jurisdiction under 15 U.S.C. § 1121 and 18 U.S.C. § 1964.   The court has jurisdiction over the unfair competition claims herein under the provisions of 28 U.S.C. §  1338(b) in that such claims are joined with a substantial and related claim under the Trademark Laws of the United States, 15 U.S.C. § §  1051 et seq.   The court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. §  1367 since those claims are so related to other claims in this action that they form part of the same case or controversy.

40.     Venue is proper in the Southern District of Texas based on 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.  Facts

**A. The Regulatory Framework**

*i. Houston*

41.     The City of Houston (also referenced herein as "Houston") has a statutory duty to regulate and control taxicab transportation services.   Section 215.004(a) of the Texas Local Government Code states:

(a)   To protect the public health, safety, and welfare, a municipality by ordinance:

  (1)   shall license, control, and otherwise regulate each private passenger vehicle, regardless of how it is propelled, that provides passenger taxicab transportation services for compensation and is designed for carrying no more than eight passengers; and

13

(2)  may license, control, and otherwise regulate each private passenger vehicle, regardless of how it is propelled, that provides passenger limousine transportation services for compensation and is designed for carrying no more than 15 passengers.

Part (b) of Section 215.004 also provides guidance on what a city might include in its regulations in order to protect the public, saying:

(b)  The ordinance may include:
(1)  regulation of the entry into the business of providing passenger taxicab or limousine transportation services, including controls, limits, or other restrictions on the total number of persons providing the services;
(2)  regulation of the rates charged for the provision of the services;
(3)  establishment of safety and insurance requirements; and
(4) any other requirement adopted to ensure safe and reliable passenger transportation service.

42.     In exercising its mandatory obligations to regulate taxicabs pursuant to Section 215.004 of the Texas Local Government Code, Houston has set forth numerous regulatory requirements in the City of Houston Code of Ordinances,[7] specifically Chapter 46 entitled "Vehicles for Hire."  One key requirement of Houston is that the vehicle be permitted to operate/drive in Houston.  Section 46-62(a) states

It shall be unlawful for any person to operate or drive or cause to be operated or driven any taxicab upon and over the streets of the city unless a current permit has been issued for the taxicab by the director in accordance with this article.

43.     Additionally, Section 46-86(a) requires that the driver of the taxicab be approved by Houston, stating: "It shall be unlawful for any person who does not hold a current and valid license issued under this division to operate a taxicab on the streets of the city."

44.     In addition to the vehicle and driver being approved by Houston, Chapter 46 also includes a number of other important obligations and requirements, including

---

[7] The Houston Code of Ordinances can be found online at:
http://library.municode.com/index.aspx?clientId=10123.

those relating to:

        Payment of ad valorem taxes on vehicles (46-3)
        Medical exams, fingerprints and drug screenings (46-6)
        Criminal history checks (46-7)
        The age and mechanical condition of taxicabs (46-20)
        Identification, color scheme, certification decal and stool light (46-22 to 24)
        Use meters, subject to City inspection (46-30)
        Follow City-established taxi rates (46-31)
        Pass an initial vehicle inspection and annually thereafter (46-37)
        Vehicle condition and driver behavior (46-43 to 44)
        Insurance coverage or proof of qualification as a self-insurer (46-67)
        Annual permit fees (46-68)
        Licensee qualifications, including medical exam, background checks etc. (46-88)
        Limited driving periods for licensees (46-113)

45.    Texas' mandate to regulate taxicab transportation services is essential to the transportation of those most in need of such services, or as the City of Houston puts it:

". . . Clearly Texas state law recognizes the very essential nature of taxicab services and the need for strict regulation.  In fact, research consistently shows that certain segments of our population -specifically the elderly, disabled, and low-income individuals and families - depend on taxi service for day-to-day activities, and taxi service may be "their only available means of transportation".

46.    Through this regulatory framework, Houston has established a relationship with the taxicab industry whereby in exchange for the provision of heavily regulated services by the industry, Houston allows permit holders the opportunity to receive a fair return on their investment.  The City of Houston has acknowledged this concept of cross-subsidization, meaning that Houston's grant of authority to a limited number of taxicab services (determined by a formula established by the City of Houston) includes corollary obligations to transport all people without discrimination and to be available 24/7, among other provisions such as providing wheelchair-accessible vehicles at no extra cost to the passenger, providing   a 10% discount for seniors, among a host of other regulatory requirements:

We must also take into account the implied Regulatory Compact that exists

15

between the regulator and the industry – i.e. taxicabs are **required** to provide service to **all** customers within the city limits. In return for this obligation to serve, the taxicab companies are given the opportunity to receive their investment and cost of providing the service, and also an opportunity to earn a fair return on their investment.

*ii. San Antonio*

47.    In the City of San Antonio (hereafter "San Antonio"), the operation of vehicles for hire is governed by its City Code of Ordinances Chapter 33.[8]   Section 33.006 requires that the Defendants maintain operating permits, saying:

(a) A person shall not knowingly operate, allow to be operated, or cause to be operated, a ground transportation service as defined in section 33-003 of this chapter, or any other service providing or related to ground transportation service, without a current and valid operating permit issued under this chapter, nor shall a person transport a passenger for hire from within the city unless the person driving the vehicle for hire or another who employs or contracts with said driver has a current and valid operating permit under this chapter.

(b) No person shall knowingly represent a vehicle as a vehicle for hire nor use or offer the use of such vehicle in a ground transportation service unless the vehicle being so represented, used, or offered for use has a current and valid operating permit under this chapter.

(c) A holder of an operating permit issued under this chapter shall not operate a ground transportation service, other than for the type of service for which an operating permit has been granted.

(d) Before an operating permit is granted, a written application for such on a form provided for that purpose must be submitted to and approved by the director in accordance with the provisions of this chapter.

(e) No person for compensation or at any charge to a passenger shall by any means (including but not limited to any data or electronic communication, any telephone and cellular service, any software, any application, any internet service, and any physical presence) operate, arrange, dispatch to or solicit a vehicle for hire unless permitted under this chapter. A person is responsible for violations of this chapter by his own conduct, by the conduct of another person if acting with intent to violate this chapter he solicits, encourages, directs, aids, or attempts to aid another person to violate this chapter, or by both.

---

[8] The San Antonio Code of Ordinances can be found online at http://library.municode.com/index.aspx?clientId=11508.

(f) A person commits an offense if he violates this section. A separate offense is committed each day during which an offense occurs. An offense committed under this section is punishable by a fine of not more than five hundred dollars ($500.00). Prosecution for an offense under this section does not prevent the use of the enforcement remedies provided in section 33-074 of this chapter.

48.     Additionally, permit holders in San Antonio must meet a host of other regulatory requirements, including but not limited to maintaining insurance or qualifying as a self-insurer, charging established rates, and maintaining vehicles of a certain maximum age, among other requirements.

49.     Further, pursuant to Section 33-039, drivers must also have a permit before driving a vehicle for hire in San Antonio, and pass other qualifications and background checks established by the San Antonio Code of Ordinances.

**B. Defendants' Illegal Operations**

50.     Despite the numerous regulatory requirements placed upon transportation services in Houston and San Antonio, Defendants began operating in these cities without authority or permission, and in complete disregard of the law.

*i. Houston*

51.     On or about February 20, 2014, transportation companies Uber and Lyft began taxicab operations in the City of Houston without complying with the permitting requirements of Houston City Ordinance 46-62 and presumably without complying with most or all of the other regulatory requirements in Chapter 46 of the Houston Code of Ordinances, including but not limited to maintaining the required insurance, having properly inspected vehicles, and charging city-approved fares, among others.[9]

52.     Examples of receipts for charged trips by the Defendants in Houston are attached hereto.[10]   Further, the City of Houston Administration & Regulatory Affairs Department has issued 26 citations relating to the violation of Chapter 46, including

---

[9] http://blog.uber.com/2014/02/21/saddle-up-houston-uberx-has-finally-arrived-2/; *see also Spears Ex. F2.*
[10] *See Kamins Affidavit; Murphy Affidavit.*

citations to both Defendants and their drivers.[11]

       *ii. San Antonio*

53.     On or about March 24 (Lyft) and March 28 (Uber),[12] Defendants began taxicab operations in the City of San Antonio without complying with the permitting requirements of San Antonio City Ordinances and presumably without complying with most or all of the other regulatory requirements to which they are bound, including but not limited to maintaining the required insurance, having properly inspected vehicles, having licensed drivers, and charging city-approved fares, among others.   These actions resulted in the issuance of at least one cease and desist letter by the San Antonio Chief of Police.[13]

54.     Examples of receipts for charged trips by the Defendants in San Antonio are attached hereto.[14]

55.     Defendants' operations outside of the regulatory framework in Houston and San Antonio, not only interferes with the Regulatory Compacts that the Plaintiffs have with their respective jurisdictions, but also creates an unfair competitive advantage since they are attempting to capitalize on all the benefits of being in the taxicab industry without bearing the burden of the costs, obligations and regulations associated with same. These actions have caused and will continue to cause damages to the Plaintiffs as described further below.

**C. Defendants' Scheme to Defraud**

56.     Uber's own words reveal the intentional strategy the Defendants have utilized to further their profit motives.  "Over the last year, new startups have sought to compete with Uber by offering transportation services without traditional commercial insurance or licensing.  Uber refrained from participating in this technology sector -

---

[11] *See Spears Ex. A* (Paez Letter).
[12] http://blog.uber.com/UberSALove; *see also Spears Ex. F5.*
[13] *See Bouloubasis Affidavit Ex. B (Cease & Desist Letter).*
[14] *See Bouloubasis Affidavit.*

known as ridesharing - due to regulatory risk that ridesharing drivers may be subject to fines or criminal misdemeanors for participating in non-licensed transportation services."[15]   In its own policy paper, Uber acknowledges the illegal business model of Lyft and similar misnamed "ridesharing" transportation services, then explains that they will do the same thing in an effort to compete with Lyft and other unlicensed transportation providers.[16]   Uber continues by saying  "...companies have emerged, most notably Lyft and Sidecar, whose goal is to offer incredibly low-cost transportation by working exclusively with unlicensed, non-commercially insured vehicles and drivers."[17] As Uber further admits, Uber and Lyft are betting that "Regulators for the most part will be unable to act or enforce in time to stop them before they have a critical mass of consumer support."[18]

57.    To obtain this critical mass of consumer support for their illegal operations, Uber and Lyft have decided to engage in a scheme and pattern of fraud on consumers by means of false pretenses and misrepresentations with regard to their business' model, its legality, and the safety of the service and drivers they provide.  A few of these false representations are highlighted below.

*i. Fraud #1 - Misrepresenting themselves as a "Ridesharing" company.*

58.    The Defendants seem to think that by self-designating their operations as "Ridesharing" they are somehow precluded from regulation, and further, that they may convince unsuspecting consumers that they are something they are not.  In reality, the Defendants are offering on-demand transportation services for compensation and subject to all the same regulations as the Plaintiffs.

59.    The term "ridesharing" itself is a noun and is defined as "The act or an instance of sharing motor vehicle transportation with another or others, especially

---

[15] http://blog.uber.com/2013/04/12/uber-policy-white-paper-1-0/; *see also Spears Ex. D.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

among commuters."  *See* The American Heritage® Dictionary of the English Language, Fifth Edition copyright ©2013 by Houghton Mifflin Harcourt Publishing Company.  23 U.S.C. § 101 further describes "carpools, and real-time ridesharing projects, such as projects where drivers, using an electronic transfer of funds, recover costs directly associated with the trip provided through the use of location technology to quantify those direct costs, subject to the condition that the cost recovered does not exceed the cost of the trip provided."

60.     Section 46-1 of the City of Houston Code of Ordinances references ride sharing in the definition of the term "For Hire", saying:

> *For hire* means providing, or offering to provide, a transportation service in exchange for any form of payment or gratuity, whether monetary or other valuable consideration.  The term expressly excludes car pooling or ride sharing arrangements for which no fee is imposed.

61.     The operations of the Defendants are nowhere close to carpools and certainly not ridesharing.  Indeed as Uber itself describes, the Defendants are "offering transportation services without traditional commercial insurance or licensing."[19]   The Defendants are for-profit companies, charging fares to customers for on-demand transportation services, not simply trying to recover the cost of the trip provided.

62.     Uber misleads consumers by advertising itself as a "ridesharing" option in Houston when it is in fact a vehicle-for-hire service operating illegally.  An Uber Blog post published on February 21 entitled "Houston uberX: Better, Cheaper, Faster Than a Taxi," refers to uberX as "Uber's ridesharing option."[20]  Uber communicates to the world that its uberX transportation service is a "ridesharing" service.  It also claims it "is Uber's ridesharing option in Houston...".[21]   The Twitter account @Uber_Houston which, upon information and belief is operated by Uber, has also called uberX "Uber's ridesharing

---

[19] http://blog.uber.com/2013/04/12/uber-policy-white-paper-1-0/; *see also Spears Ex. D.*
[20] http://blog.uber.com/2014/02/21/52133/; *see also Spears Ex. F1.*
[21] http://blog.uber.com/2014/02/21/saddle-up-houston-uberx-has-finally-arrived-2/; *see also Spears Ex. F2.*

option in Houston." (2/22/2014 reply to @Daflash713). Despite these repeated claims that uberX is a "ridesharing option," the Uber website provides a coverage map for Houston which includes rates for a "Base Fare," "Per Minute," and "Per Mile" costs as well as a "Min Fare" and "Cancellation Fee".[22] The @Uber_Houston Twitter account has also posted that Uber riders "simply request, ride & pay" via their mobile phones. Allowing users to summon a driver and then charging for rides based on time and distance is not "ridesharing," it is providing a vehicle "for hire" as defined in the Houston Code of Ordinances. As stated above, Uber does not have a permit or a license to operate a vehicle for hire in Houston.

63.     Similar tactics have been employed in San Antonio, yet it is clear that Uber does not provide ridesharing in San Antonio either. Uber charges fares to its customers and advertises the cost on its website, along with a disclaimer saying that its rates change at times of "intense demand."[23]

64.     Likewise, Lyft describes its service as "On-demand ridesharing" or "an on-demand ride share platform".[24]

65.     Lyft does not provide ridesharing services either. Lyft charges fares to its customers, and also advertises pricing for Houston and San Antonio on its website.[25]

66.     Yet, despite the clear fact that they are not ridesharing participants or a neighborhood carpool, Defendants continue to make these misrepresentations to further their scheme to defraud the public and avoid the regulatory oversight that applies to their transportation services.

*ii. Fraud #2 - Misrepresentation that Defendants can operate legally.*

67.     As discussed above, the Defendants are not permitted to operate their

---

[22] https://www.uber.com/cities/houston; *see also Spears Ex. F3.*
[23] *See* https://www.uber.com/cities/san-antonio and https://www.uber.com/cities/houston; *see also Spears Ex. F4 and F3.*
[24] http://www.lyft.com/help?article=1450425; *see also Spears Ex. I1.*
[25] http://www.lyft.com/help?article=1475719 and http://www.lyft.com/help?article=1398910; *see also Spears Ex. I3 & I2.*

unlicensed transportation services in Houston or San Antonio.  Despite this fact, the Defendants continue to operate under the false pretense that they are a legal form of transportation.  Defendants are perpetuating this falsity with a specific intent to defraud the public in the furtherance of their self-interested profit motives.

68.    Through its website, blog, and Twitter accounts, to name a few, Uber has consistently defrauded the public as to the legality of their operations in Houston and San Antonio.

69.    Uber misrepresents that its vehicle-for-hire business operates legally in Houston.  For example, an Uber blog post on February 21, 2014 is entitled "Saddle Up Houston, UberX Has Finally Arrived!"[26]  Additionally, the Uber website provides a coverage map for Houston which includes rates for a "Base Fare," "Per Minute," and "Per Mile" costs as well as a "Min Fare" and "Cancellation Fee".[27] Statements that Uber has "[f]inally [a]rrived," that "Houston finally has [uber]," as well as the coverage map indicating rates and prices Uber charges its passengers are designed to entice customers to use Uber by misleading them into believing that Uber is providing legitimate vehicle for hire services in Houston.

70.    Uber also misrepresents that its vehicle-for-hire business operates legally in San Antonio.  On March 28, 2014 The Twitter account @Uber_SanAntonio which, upon information and belief is operated by Uber, stated "San Antonio, uberX has arrived!"  This same message provides a link directing viewers to an Uber blog post entitled "Saddle Up, San Antonio, Your UberX Has Arrived!" which states: "we're proud and pumped to be launching in Alamo City" and that "San Antonio now gets to embrace and enjoy the Uber lifestyle."[28]  The Uber website also features a coverage map for San Antonio which states: "LAUNCHING SOON! LIMITED CARS AVAILABLE NOW".[29]  The

---

[26] http://blog.uber.com/2014/02/21/saddle-up-houston-uberx-has-finally-arrived-2/; *see also Spears Ex. F2.*
[27] https://www.uber.com/cities/houston; *see also Spears Ex. F3.*
[28] http://blog.uber.com/UberSALove; *see also Spears Ex. F5.*
[29] https://www.uber.com/cities/san-antonio; *see also Spears Ex. F4.*

statement that "uberX has arrived" in San Antonio, that Uber is "launching" in San Antonio, and that the "Uber lifestyle" is now available in San Antonio, as well as a coverage map of San Antonio indicating that cars are available are all designed for the sole purpose of enticing consumers to use Uber by misleading them into believing that Uber is providing legitimate vehicle for hire services in San Antonio.

71.     Additionally, Uber says the following on its website: "LICENSED & INSURED - From insurance to background checks, every driver meets all local regulations."[30]  This statement is absurdly false.  In fact, Uber may not be in compliance with any portion of Chapter 46 of the City of Houston Code of Ordinances or Chapter 33 of the City of San Antonio Code of Ordinances, but most certainly is not in compliance with the requirement that its vehicles be permitted and drivers be licensed.  Further, Section 46-11.1(a) of the City of Houston Code of Ordinances states "All mobile dispatch services shall be responsible for ensuring that any driver assigned to provide transportation services and the vehicle used in the rendition of the transportation services are duly authorized to provide such services pursuant to this chapter."  It is evident that the Defendants do not ensure compliance with this section.

72.     On its Twitter feed, @Uber_Houston,[31] Uber  continues to mislead consumers about its service:

---

[30] https://www.uber.com/drivers; *see also Spears Ex. F6.*

[31] https://twitter.com/Uber_Houston; *see also Spears Ex. G.*



**Brittany Glover** @Bgloverlover · Apr 4
@Uber_Houston do you offer town car service in houston?
Expand                              ← Reply  ⭑ Retweet  ★ Favorite  ••• More

**Uber_Houston** @Uber_Houston · Apr 4
@Bgloverlover right now we offer uberX, the low-cost Uber with Ridesharing. Stay tuned for more to come!
🗨 Hide conversation                    ← Reply  ⭑ Retweet  ★ Favorite  ••• More

1:26 PM - 4 Apr 2014 · Details



**Raven™** @RaeeeXOXO · Mar 31
@Uber_Houston is Uber approved yet? So I can start spreading my promo code around Houston ;p
Expand                              ← Reply  ⭑ Retweet  ★ Favorite  ••• More

**Uber_Houston** @Uber_Houston · Apr 1
@RaeeeXOXO we're still here, but we need to continue and spread the #UberLove to make sure we're in Houston for good! #HoustonNeedsUber
🗨 Hide conversation                    ← Reply  ⭑ Retweet  ★ Favorite  ••• More

12:32 PM - 1 Apr 2014 · Details

....



**tommy** @tommyhtown · Mar 13
@HBJ_MollyRyan I received an email From @uber that they'll start charging on my next ride.Did they get an approval from the city of Houston?
Expand                              ← Reply  ⭑ Retweet  ★ Favorite  ••• More

**Uber_Houston** @Uber_Houston · Mar 13
@tommyhtown We're still working w/ the City to modernize city regulations, but in the interim are excited to offer the best service we can.
🗨 Hide conversation                    ← Reply  ⭑ Retweet  ★ Favorite  ••• More

9:21 AM - 13 Mar 2014 · Details

....



When asked directly about their approval status, Uber is dishonest towards consumers about their illegal transportation service, instead giving misleading responses like "We're Here!".

73.     The Lyft website states that "drivers collect donations for rides" in both Houston and San Antonio[32] and that "[i]n some markets, donations are voluntary".[33]  In spite of these representations, the Lyft Coverage Maps for both Houston[34] and San Antonio[35]  indicate that there is a "Cost Per Mile," a "Cost per minute," a "Pickup" fee, a "Trust & Safety fee," as well as a "Minimum" of $5.00 and a $5.00 "Cancellation fee." What's more, if a rider fails to submit payment within 24 hours, a "recommended amount" will automatically be charged to the riders card.[36]

74.     Lyft's online misrepresentations insinuate that Lyft operates a legitimate vehicle-for-hire business in Houston and San Antonio.  For example, one photo album on Lyft's Facebook account is entitled "Houston, we have Lyftoff" and states "We had an amazing time launching Lyft in Houston."  Another photo album linked to the same Facebook account is entitled "Lyft Lands in San Antonio" and states "Following Dallas

---

[32] http://www.lyft.com/drive/faq?article=1415358; *see also Spears Ex. I4.*
[33] http://www.lyft.com/drive/faq?article=1229040; *see also Spears Ex. I5.*
[34] http://www.lyft.me/help?article=1398910; *see also Spears Ex. I2.*
[35] http://www.lyft.com/help?article=1475719; *see also Spears Ex. I3.*
[36] https://www.lyft.me/help?article=1003538; *see also Spears Ex. I6.*

and Houston, Lyft has landed in our third city in Texas.  San Antonio looks pretty in pink."  Additionally, the Lyft website features coverage maps showing areas of operation in both Houston[37] and San Antonio[38].  A March 2014 Lyft blog post even proclaims that Lyft has "expanded" into Houston.  These coverage maps, as well as the statements that Lyft has "launched," "landed," or "expanded" into the Houston and San Antonio areas are designed to for the sole purpose of enticing consumers to use Lyft by misleading them into believing that Lyft is providing legitimate vehicle for hire services in these municipalities.

75.     Despite claims that Lyft vehicles will be readily identifiable by pink moustaches affixed to a vehicle's grille, Lyft does not provide this accessory to its drivers until they have completed thirty (30) trips.[39]

76.     Lyft repeatedly states on its website that Lyft drivers must comply with state and local regulations.  The Houston Code of Ordinances does not allow licensees or permitees of taxicabs to operate "any taxicab vehicle that is more than six years old." (Houston Code of Ordinances Sec. 46-20).  Lyft requires only that a driver's vehicle be "year 2000 or newer."[40]  Consequently, even if Lyft did  have permits or licenses to operate their vehicle-for-hire service in Houston, Lyft would not be in compliance with the vehicle age and mechanical condition requirements of Chapter 46 of the Houston Code of Ordinances.

77.     Lyft misrepresents to its customers that it is operating a lawful business in Houston.  For example, Lyft repeatedly represents on its website that drivers are required to follow state and local regulations.  However, Chapter 46 of the Houston Code of Ordinances – which governs vehicles for hire, such as Lyft – clearly states that "[i]t shall be unlawful for any driver of any vehicle for hire to refuse to transport a

---

[37] http://www.lyft.me/help?article=1398910; *see also Spears Ex. I2.*
[38] http://www.lyft.com/help?article=1475719; *see also Spears Ex. I3.*
[39] http://www.lyft.com/drive/faq?article=1286071; *see also Spears Ex. I8.*
[40] http://www.lyft.com/help/?article=1003522; *see also Spears Ex. I7.*

passenger on a basis of race, color, religion, sex, national origin, age, or disability. (Houston Code of Ordinances Sec. 46-2).  Nonetheless, the Lyft website advises drivers that although they "should never decline a ride based on a discriminatory reason," they "always have the right to decide if [they] feel comfortable picking up a passenger."[41]

*iii. Fraud #3 - Misrepresentations as to Insurance Coverage*

78.     The Defendants misrepresent the available insurance coverage in an attempt to lure customers to its service.

79.     Uber represents:

1. At minimum, there will be a $1,000,000 per-incident insurance policy applicable to ridesharing trips. This insurance applies to any ridesharing trip requested through the Uber technology platform.

80.      This representation is what appears live on Uber's website as of the date of this filing.[42]  Yet, prior versions of the same post read a bit different:[43]

1. At minimum, there will be a $2,000,000 insurance policy applicable to ridesharing trips. This insurance applies to any ridesharing trip requested through the Uber technology platform.

81.     With the stroke of a few keys, passengers appear to have lost half their coverage!  In reality it does not matter, their alleged coverage is illusory and never really existed in the first place.  Plaintiffs have sought the help of insurance experts to review the claims of the Defendants and determine from the few documents that have been made public whether or not the Defendants actually provide anything close to what they claim.  This explains why the Defendants try so hard to avoid governmental regulation.

82.     First, the policy that Uber finally disclosed after being forced by regulators to justify their claims, appears to be an excess and surplus lines policy, whose market is

---

[41] http://www.lyft.com/drive/faq?article=1229182; *see also Spears Ex. I9.*
[42] http://blog.uber.com/2013/04/12/uber-policy-white-paper-1-0/; *see also Spears Ex. D.*
[43] *See Serio Affidavit.*

"one that is subject to a bare minimum of insurance regulation, as opposed to traditional personal, taxi/livery or commercial auto insurance policy, which are heavily regulated by State authorities for pricing, policy scope and language and unfair claim settlement protections."[44]   Further, Uber's insurer itself, James River Insurance Company is not authorized to issue insurance in the form of commercial auto liability coverage in the State of Texas.[45]   Yet, even if they were authorized, it appears there would be no coverage under the policy.

83.   The James River policy actually insures companies referenced as  Raiser, an apparent subsidiary company of Uber of unknown role or responsibility and an entity largely unknown to the end user of Uber's services.[46]   It appears that the coverage in the policy is only applicable if Raiser is found liable to the third party for the injuries sustained in the accident.[47]   Given the unclear role of Raiser in the process of retaining and operating the ride referral system, it is difficult to imagine how a driver or a passenger would be able to prove that Raiser was responsible for the injuries sustained in an accident.[48]   Further, it appears coverage exists only when the accident was caused in whole or in part by the actions of Raiser.  Thus, if the driver causes the accident solely, there does not appear to be any coverage afforded to anyone by the Raiser policy.[49]

84.   This lack of meaningful coverage becomes critical when one examines Uber's contracts with its transportation entities.  Uber's services agreements with the drivers or their companies simply require that the drivers carry the minimum insurance required by law.[50]   These contracts do not even require that the driver or the company

---

[44] *See Serio Affidavit.*
[45] *See Vaught Affidavit.*
[46] *See Serio Affidavit.*
[47] *See Serio Affidavit.*
[48] *See Serio Affidavit.*
[49] *See Serio Affidavit.*
[50] *See Serio Affidavit.*

carry commercial automobile insurance.[51]   State auto insurance mandates usually provide very low insured limits.[52]   Further, it appears that many drivers may only carry private personal auto coverage.[53]   However, standard personal auto insurance forms issued nationwide contain an exception to coverage when the personal auto is used as a public or livery conveyance or in any other commercial manner.[54]   In the worst case scenario, there may be no insurance coverage at all for an accident in one of Uber's vehicles, and at best, the coverage may only be minimal, and not of the substance and limits enough to compensate a driver or passenger for injuries.[55]

85.     When you combine these factors with the severely restrictive disclaimers in Uber's contracts (e.g. "We will not assess the suitability, legality or ability of any third party transportation providers and you expressly waive and release the company from any and all liability, claims or damages arising from or in any related to the third party transportation provider.")[56], Uber appears to have completely locked out any opportunity for anyone to access their purported insurance coverage by preventing anyone from successfully claiming that Uber or Raiser is responsible for any injuries from any auto accident occurring on any of the trips that they arrange.[57]

86.     Uber is inappropriately marketing its James River coverage as a protection for the drivers and passengers which are doing business with Uber.[58]   This is not only clear from the plain meaning reading of the policy language, but given the lower level of regulatory oversight for the excess and surplus lines market, individuals may experience difficulty should the circumstances arise that the individual may have to attempt to file a claim against such ill-fitting insurance, and both the passenger and

---

[51] *See Serio Affidavit.*
[52] *See Serio Affidavit.*
[53] *See Serio Affidavit.*
[54] *See Serio Affidavit.*
[55] *See Serio Affidavit.*
[56] *See Spears Exhibit E* (Uber Terms of Service).
[57] *See Serio Affidavit.*
[58] *See Serio Affidavit.*

driver would face an extraordinarily difficult legal challenge to ever have the chance to hold Uber or its insurance policy responsible.[59]

87.     Yet, Uber says the following on its website: "LICENSED & INSURED - From insurance to background checks, every driver meets all local regulations."[60]  As evidenced by the letter from the City of Houston, both Uber and Lyft have failed to meet local regulations,[61] including the requirement that the commercial auto coverage be issued by an authorized auto liability lines carrier on the Texas Department of Insurance's List of Authorized Insurance Companies.[62]

88.     Uber also represents that their "ridesharing transportation partners carry best-in-class commercial insurance coverage in the event of an accident", that the "vast majority of personal insurance policies cover" the period when an Uber driver is not on an actual trip,[63] and that, in addition to Uber's "corporate insurance policy," "all Uber rides are backed by the driver's insurance policy."[64]  In truth, most, if not all personal automobile insurance policies exclude coverage for commercial operations.[65]  Thus, the representations are overtly false.

89.     Not surprisingly, Lyft makes similar claims as Uber, claiming "From background checks to our first-of-its-kind $1,000,000 liability insurance, we go above and beyond to create a more safe community."[66]  Yet given the similarity between Uber and Lyft's purported coverage, as well as their broad contractual disclaimers,[67] and the complete secrecy shown with regard to the actual policies, upon information and belief, the Lyft insurance policies have also been misrepresented to the public.

*iv. Fraud #4 - Misrepresentations as to Safety*

---

[59] *See Serio Affidavit.*
[60] https://www.uber.com/drivers; *see also Spears Ex. F6.*
[61] *See Spears Ex. A* (Paez Letter).
[62] *See Vaught Affidavit.*
[63] http://blog.uber.com/uberXridesharinginsurance; *see also Spears Ex. F7.*
[64] http://blog.uber.com/2014/02/21/52133/; *see also Spears Ex. F1.*
[65] *See Vaught Affidavit.*
[66] http://www.lyft.me/safety; *see also Spears Ex. I10.*
[67] http://www.lyft.me/terms; *see also Spears Ex. H.*

90.     Because passengers lack reasonable information about the Defendants' drivers and the vehicles, they must rely solely on the limited information provided by the unregulated carrier.  This puts passengers in a completely vulnerable position, especially considering that the Defendants blatantly ignore the regulations that were established in Houston and San Antonio to protect the public welfare by ensuring transportation providers comply with certain standards.

91.     Uber's advertisements regarding its commitment to rider safety are contrary to the obligations Uber assumes under its Terms of Service.  Uber states in a March 28, 2014 blog post advertising the inception of service in San Antonio that Uber can be used to "request a safe, reliable ride on-demand."[68]  Uber also represents that uberX drivers undergo a background check, driving history check, vehicle inspection, and "[o]ngoing quality controls."[69]  Uber even holds itself out to be the "safest ground transportation out there"[70] and claims that "using Uber's technology adds additional layers of safety and security to getting a ride…"[71]  Uber repeatedly represents that it has a strong commitment to rider safety  ("[Uber's] highest priority is connecting our users to the safest, most reliable transportation providers…"[72];  "[Uber's] commitment to safety has always been [Uber's] top priority"[73]; "your safety and satisfaction remain [Uber's] highest priority."[74]; "Safety of riders and drivers is of paramount importance at Uber…")[75].  In support of this purported commitment to rider safety, Uber contends that "all ridesharing drivers undergo background checks that are among the most stringent in the industry"  and  "all ridesharing transportation partners carry best-in-class commercial insurance coverage in the event of an accident."[76]  Leandre Johns, general manager of

---

[68] http://blog.uber.com/UberSALove; *see also Spears Ex. F5.*
[69] http://blog.uber.com/2014/02/21/52133/; *see also Spears Ex. F1.*
[70] http://blog.uber.com/uberXridesharinginsurance; *see also Spears Ex. F7.*
[71] http://blog.uber.com/sfsafety; *see also Spears Ex. F8.*
[72] http://blog.uber.com/sfsafety; *see also Spears Ex. F8.*
[73] http://blog.uber.com/uberXridesharinginsurance; *see also Spears Ex. F7.*
[74] http://blog.uber.com/2014/02/21/52133/; *see also Spears Ex. F1.*
[75] http://blog.uber.com/expandedbackgroundchecks; *see also Spears Ex. F9.*
[76] http://blog.uber.com/uberXridesharinginsurance; *see also Spears Ex. F7.*

Uber in Texas has stated that Uber's "mechanisms" work to "ensure the safety, comfort, and efficiency of the Uber experience."[77]

92.      Yet, the fact that Uber's statements are just additional misrepresentations to further their scheme to defraud is evidenced by their amazingly broad waiver and disclaimer provisions.  Proving that their commitment is actually to serve their illicit profit motives, Uber's terms of service attempt to absolve themselves of all responsibility for passenger safety.  Here are a few examples from Uber's 2013 Terms and Conditions:

> COMPANY. THE COMPANY MAKES
> NO REPRESENTATION, WARRANTY,
> OR GUARANTY AS TO THE
> RELIABILITY, SAFETY, TIMELINESS,
> QUALITY, SUITABILITY OR
> AVAILABILITY OF ANY SERVICES,
> PRODUCTS OR GOODS OBTAINED BY
> THIRD PARTIES THROUGH THE USE
> OF THE SERVICE OR APPLICATION.
> YOU ACKNOWLEDGE AND AGREE
> THAT THE ENTIRE RISK ARISING OUT
> OF YOUR USE OF THE APPLICATION
> AND SERVICE, AND ANY THIRD
> PARTY SERVICES OR PRODUCTS
> REMAINS SOLELY WITH YOU, TO THE
> MAXIMUM EXTENT PERMITTED BY
> LAW.
>
>              ...

---

[77] http://www.chron.com/opinion/outlook/article/Johns-Service-would-fill-gap-in-transportation-4778041.php.

THE COMPANY MAY INTRODUCE
YOU TO THIRD PARTY
TRANSPORTATION PROVIDERS FOR
THE PURPOSES OF PROVIDING
TRANSPORTATION. WE WILL NOT
ASSESS THE SUITABILITY, LEGALITY
OR ABILITY OF ANY THIRD PARTY
TRANSPORTATION PROVIDERS AND
YOU EXPRESSLY WAIVE AND
RELEASE THE COMPANY FROM ANY
AND ALL ANY LIABILITY, CLAIMS OR
DAMAGES ARISING FROM OR IN ANY
WAY RELATED TO THE THIRD PARTY
TRANSPORTATION PROVIDER. YOU

...

THE QUALITY OF THE
TRANSPORTATION SERVICES
SCHEDULED THROUGH THE USE OF
THE SERVICE OR APPLICATION IS
ENTIRELY THE RESPONSIBILITY OF
THE THIRD PARTY PROVIDER WHO
ULTIMATELY PROVIDES SUCH
TRANSPORTATION SERVICES TO
YOU. YOU UNDERSTAND,
THEREFORE, THAT BY USING THE
APPLICATION AND THE SERVICE,
YOU MAY BE EXPOSED TO
TRANSPORTATION THAT IS
POTENTIALLY DANGEROUS,
OFFENSIVE, HARMFUL TO MINORS,
UNSAFE OR OTHERWISE
OBJECTIONABLE, AND THAT YOU
USE THE APPLICATION AND THE
SERVICE AT YOUR OWN RISK.

*See Spears Exhibit E* (Uber Terms of Service).

93.     So, by its own terms of service, after making representation after representation about the quality, safety, and reliability of its services, Uber attempts to

33

disclaim all legal responsibility for those misrepresentations, and states that it makes no representation as to safety of its services, will not assess the suitability of its drivers, and that even though consumers may be exposed to dangerous and harmful transportation, the consumer does so at their own risk. *Id.*

94.     Lyft equally proclaims a commitment to safety in order to deceive consumers about Lyft's actual commitment to rider safety.  Lyft claims to "go the extra mile for safety" and that "safety is [Lyft's] top priority."[78]  Yet, their terms show the true motive, profit at all costs.  Lyft's March 4, 2014 terms of service[79] contain similar waivers and disclaimers to Uber:

> Lyft does not offer transportation services and Lyft is not a transportation company. We are not involved in the actual transportation provided by Drivers to Riders. As a result, We have no control over the quality or safety of the transportation that occurs as a result of the Service; nor do We have any control over the truth or accuracy of the of Participants' information listed on the Lyft Platform. We cannot ensure that a Driver or Rider is who he or she claims to be or that a Driver or Rider will actually complete an arranged service.
>
> ...
>
> AS A RESULT, WE WILL NOT BE LIABLE FOR ANY DAMAGES, DIRECT, INDIRECT, INCIDENTAL AND/OR CONSEQUENTIAL, ARISING OUT OF THE USE OF LYFT OR THE SERVICES, INCLUDING, WITHOUT LIMITATION, TO DAMAGES ARISING OUT OF COMMUNICATING AND/OR MEETING WITH OTHER PARTICIPANTS OF LYFT OR THE SERVICES, OR INTRODUCED TO YOU VIA LYFT OR THE SERVICES. SUCH DAMAGES INCLUDE, WITHOUT LIMITATION, PHYSICAL DAMAGES, BODILY INJURY, DEATH AND OR EMOTIONAL DISTRESS AND DISCOMFORT. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, OUR LIABILITY, AND THE LIABILITY OF OUR SUBSIDIARIES, OFFICERS, DIRECTORS, EMPLOYEES, AND SUPPLIERS, TO YOU OR ANY THIRD PARTIES IN ANY CIRCUMSTANCE IS LIMITED TO $100.
>
> ...
>
> Lyft has no responsibility whatsoever for the actions or conduct of drivers or riders. Lyft has no obligation to intervene in or be involved in any way in

---

[78] http://www.lyft.me/safety; *see also Spears Ex. I10.*
[79] http://www.lyft.me/terms; *see also Spears Ex. H.*

disputes that may arise between drivers, riders, or third parties. Responsibility for the decisions you make regarding providing or accepting transportation rest solely with You. It is each rider and driver's responsibility to take reasonable precautions in all actions and interactions with any party they may interact with through use of the services. Lyft may but has no responsibility to screen or otherwise evaluate potential riders or users. Users understand and accept that Lyft has no control over the identity or actions of the riders and drivers, and Lyft requests that users exercise caution and good judgment when using the services. Drivers and riders use the services at their own risk.

*See Spears Exhibit H* (Lyft Terms of Service).

95.    As with Uber, Lyft's terms of service, contradict their public representations about the quality, safety, and reliability of its services.  As shown above, Lyft also disclaims all legal responsibility for the actions of its drivers and attempts to contractually limit its liability, including liability for death, to $100. *Id.* As with Uber, consumers who may have unknowingly agreed to these terms of service on a small cell phone screen, may have actually agreed to take their life into their own hands, despite numerous representations to the contrary.

96.    In the furtherance of their scheme to defraud, Defendants rely on the use of interstate wires, including but not limited to the use of telephones, credit card processing transaction, bank to bank payments and transfers of funds, among others.

**D. Injury to the Plaintiffs**

97.    The Plaintiffs, by virtue of being permit holders, pay license fees to Houston and San Antonio, airport fees, and a host of other regulatory and business costs and expenses.  Moreover, as a condition of obtaining their permits each licensed taxi operator must demonstrate that all property/ad valorem taxes have been paid on their vehicles.  For example, in the furtherance of its obligations, Plaintiff GHTC has paid and continues to pay Houston an annual taxicab permit fee of $562.00 per taxi cab per year, for a total fee of $723,294 annually.[80]  Similarly, Plaintiff HTS pays $227,048 while Taxis Fiesta pays $89,358 in taxi permit fees to the City of Houston annually.

---

[80] *See Barrett Affidavit.*

98.     By operating illegally with non-permitted vehicles, the Defendants are skirting applicable regulations and paying ZERO dollars in permit fees to San Antonio and Houston.   Their actions violate both state and Federal laws, and result in the realization of illicit profits to the detriment of the Plaintiffs, while at the same time depriving the Plaintiffs of profits they would otherwise obtain but for the actions of the Defendants.

99.     Defendants' actions described herein are rendering valueless the licenses/permits owned by the Plaintiffs and for which they have paid considerable amounts to acquire and maintain.   If the same transportation service can be run without incurring these expenses and without complying with government regulation, then what possible benefit can be obtained from owning a vehicle permit or license to drive?

IV.   Causes of Action

100.     Suit for Declaratory Relief - Plaintiffs incorporate the paragraphs, above, in furtherance of its plea that actual controversies exist as to the rights and legal relations between the Plaintiffs and the Defendants, including whether or not the Defendants are authorized to provide their services in Houston or San Antonio.   For this reason, a declaratory judgment action pursuant to 28 USC § 2201-02 is proper.

101.     Because actual controversies exist as to the ability of the Defendants to legally operate in Houston or San Antonio, Plaintiffs requests that the Court review the relevant evidence and laws and declare as follows:

a.     Uber's transportation services in the City of Houston violate the Code of Ordinances.

b.     Uber's transportation services in the City of San Antonio violate the Code of Ordinances.

c.     Lyft's transportation services in the City of Houston violate the Code of Ordinances.

d.     Lyft's transportation services in the City of San Antonio violate the Code of Ordinances.

102.   <u>RICO</u>.  Plaintiff repeats and incorporates the paragraphs above.  Plaintiff seeks any and all damages due to the Defendants violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

103.   As stated above, Defendants have engaged in a pattern of racketeering activity connected to the acquisition, establishment, conduct, or control of their respective enterprises.  In furtherance of their pattern of racketeering activity Defendants have taken multiple actions constituting wire fraud under 18 U.S.C. §1343, which amounts to or poses a threat of continued criminal activity.

104.   Defendants wire fraud consists of their scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; their use of the interstate wires for the purpose of executing the scheme; and a specific intent to defraud either by devising, participating in, or abetting the scheme.

105.   Further, the actions of the Defendants constitute a conspiracy under RICO because the Defendants along with their drivers knew of the conspiracy to commit these RICO offenses and acted in furtherance thereof.

106.   <u>Lanham Act - Misrepresentation of Services 15 U.S.C. § 1125(a)(1)(B)</u>.  Plaintiffs repeat and incorporate the paragraphs above.  Plaintiffs seek any and all damages due to the Defendants false advertising as prohibited by the Lanham Act.

107.   The Defendants have made false or misleading statements of fact about their products/services; the statements actually deceived or had the tendency to deceive a substantial segment of their audience; the deceptions are material in that they are likely to influence the consumer's purchasing decisions; the statements entered interstate commerce; and the Plaintiffs have been or are likely to be injured as a result.

108.   <u>Texas Common Law Unfair Competition</u>.   Plaintiffs repeat and incorporate the paragraphs above.   Plaintiffs seek any and all damages due to the Defendants unfair competition.

109.   Unfair competition under Texas law "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir. 1974), *quoted in United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 217 (Tex. App.— Waco 1993, writ denied).   Defendants have committed various illegal acts as shown herein, which have interfered with the Plaintiffs' ability to conduct their businesses. *See Schoellkopf v. Pledger,* 778 S.W.2d at 897, 904–05 (Tex. App.—Dallas 1989, writ denied).   This interference has caused damages to the Plaintiffs or provided Defendants with undeserved benefits for which Plaintiffs are entitled a recovery.

V. <u>Attached Evidence</u>

110.   Plaintiffs attach evidence to this complaint, or alternatively includes same in an appendix filed herewith, and incorporates the evidence into this pleading as if fully included herein, and as referenced throughout the complaint:

A.   <u>Affidavits and Exhibits attached thereto.</u>

   i.   Affidavit of Rick Barrett.

   ii.   Affidavit of John Bouloubasis.

   iii.   Affidavit of Duane Kamins.

   iv.   Affidavit of Michael Khadem.

   v.   Affidavit of Sarah Murphy.

   vi.   Affidavit of Richard Reyes.

   vii.   Affidavit of Gregory V. Serio

    viii.    Affidavit of Michael Spears.

    ix.    Affidavit of Mary Vaught.

    x.    Affidavit of Tina Williams.

## VI.  <u>Attorney Fees</u>

111.    Plaintiffs are entitled to recover reasonable and necessary attorney fees that are equitable and just under Texas Civil Practice & Remedies Code section 37.009 because this is a suit for declaratory relief, as well as pursuant to 18 USC § 1964(c) and 15 USC § 1125(a).

## VII.  <u>Damages</u>

112.    By reason of Defendants' acts alleged herein, Plaintiffs have suffered, and will continue to suffer, damages to their business, reputation, and good will and have lost sales and profits that Plaintiffs would have made but for Defendants' acts.

113.    Plaintiffs also request that the Court award as damages to the Plaintiffs, treble the amount of actual damages suffered by Plaintiffs, pursuant to 18 USC § 1964(c).

114.    Plaintiffs further request that the Court award as damages to the Plaintiffs, the greater of (1) the Defendants' profits, (2) the amount of actual damages suffered by Plaintiffs, (3) any sum above these amounts not exceeding three times the amount, or (4) any higher amount as the Court may award in its discretion according to the circumstances of this case, pursuant to 15 USC § 1117(a).

### VIII.  <u>Request for Temporary Restraining Order & Preliminary Injunction</u>

115.    Plaintiffs seek injunctive relief pursuant to common law as well as the by statute in 15 USC § 1116(a) and 18 USC § 1964(a).

116.    Plaintiffs will suffer imminent and irreparable injury if Defendants are not immediately restrained from operating illegally in Houston and San Antonio and continue to make misrepresentations as described above. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*, 415 U.S. 61, 88-89 & n.59 (1974).   Defendants have shown a complete disregard for the efforts by the respective cities in issuing cease and desist letters, as well as the issuance of actual citations for their conduct.   As such, their illegal activities are likely to continue and will cause irreparable injury to the Plaintiffs that are difficult if not possible to calculate.   However, in cases where a violation of a statute is alleged, as in this case, a showing of irreparable injury is not required. *See U.S. v. Caribbean Ventures, Ltd.*, 387 F.Supp. 1256, 1257 (D.N.J. 1974) (citing *C.A.B. v. Donaldson Line (Air Services) Limited*, 343 F.Supp. 1059 (S.D.N.Y.1972); *C.A. B. v. Modern Air Transport, Inc.*, 81 F.Supp. 803, 806 (S.D.N.Y.1949), aff'd, 179 F.2d 622 (2d Cir. 1950).

117.    In *Caribbean Ventures*, the U.S. was seeking to enjoin the defendants from proving unlicensed air transportation for hire, even though they alleged their service was free.   The court found a reasonable probability of success in favor of the U.S. and granted the injunction because the defendant was violating FAA regulations which required any person engaged in air transportation to obtain the required operating certificate.   *U.S. v. Caribbean Ventures, Ltd.*, 387 F.Supp. 1256, 1261 (D.N.J. 1974). The court further found that the "defendants fail to take into account the overriding public interest in the safe passage of air travelers..." and that the "...defendants cannot be permitted to jeopardize the public interest which the regulations were reasonably designed to protect." *Id.* at 1262.

118.    Just like in *Caribbean Ventures*, there is a substantial likelihood that Plaintiffs will prevail on the merits because Defendants are plainly operating in violation of the Houston and San Antonio ordinances.

119.   The threatened harm to Plaintiffs outweighs the harm that a temporary restraining order would inflict on Defendants because they can have no reasonable expectation of protection from their own statutory violations.

120.   An issuance of a temporary restraining order would not adversely affect the public interest and public policy because like in *Caribbean Ventures*, the public interest must weigh in favor of the safe passage of travelers, for which the regulations were designed in the first place.

121.   Since the Defendants have no right to operate their business illegally or through the execution of a scheme to defraud, the bond should be minimal.

122.   Plaintiffs ask the court to set the request for a preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against Defendants.

IX.  Request for Permanent Injunction

123.   Plaintiffs asks the court to set their application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against Defendants enjoining them forever from the conduct described herein.

X.  Conditions Precedent

124.   All conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.


WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that after final trial of this matter, that the Court enter judgment in favor of Plaintiff, with the judgment awarding the following relief:

a.      Declare that Uber's transportation services in the City of Houston violate the Code of Ordinances.

b.      Declare that Uber's transportation services in the City of San Antonio violate the Code of Ordinances.

41

c.    Declare that Lyft's transportation services in the City of Houston violate the Code of Ordinances.

d.    Declare that Lyft's transportation services in the City of San Antonio violate the Code of Ordinances.

e.    Actual damages as proven at trial in excess of this Court's minimum jurisdictional requirements, including but not limited to lost profits, Defendants profits, or any other amount as requested above;

f.    Treble and Additional Damages;

g.    Equitable relief as requested herein;

h.    Prejudgment and post-judgment interest as allowed by law;

i.    Attorney's fees;

j.    All costs of court; and

k.    Such other and further relief to which Plaintiffs are entitled.


Respectfully submitted,

PAGEL, DAVIS & HILL, P.C.


 /s/ Martyn B. Hill
MARTYN B. HILL
State Bar No. 09647460
Federal Bar No. 13806
mbh@pdhlaw.com
MICHAEL A. HARRIS
State Bar No. 24046030
Federal Bar No. 586840
mah@pdhlaw.com
1415 Louisiana Street, 22nd Floor
Houston, Texas 77002
Telephone:   713-951-0160
Facsimile:    713-951-0662
ATTORNEYS FOR PLAINTIFFS