IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GREATER HOUSTON TRANSPORTATION §
COMPANY, FIESTA CAB COMPANY, §
HOUSTON TRANSPORTATION §
SERVICES, LLC, NATIONAL CAB CO., INC., §    CIVIL ACTION NO.: 14-941
PASADENA TAXI CO., INC., DAWIT SAHLE, §
MERSHA AYELE, MOHAMED DIDI, §
GREATER SAN ANTONIO §
TRANSPORTATION COMPANY, §
ENTERPRISE TRANSPORTATION INC. §
    §
v. §
    §    JURY TRIAL DEMANDED
UBER TECHNOLOGIES, INC., and §
LYFT INC. §

### PLAINTIFFS' THIRD AMENDED COMPLAINT and REQUEST FOR PERMANENT INJUNCTION

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COME NOW, Plaintiffs as identified below, and file this Third Amended Complaint and Request for Permanent Injunction against Uber Technologies, Inc. ("Uber") and Lyft, Inc. ("Lyft").

### Introduction

1.    Plaintiffs hold the majority of the taxicab permits licensed under Chapter 46 of the City of Houston Code of Ordinances ("CHCO") Vehicles for Hire, and a substantial portion of the taxicab permits licensed under Chapter 33 of the City of San Antonio Code of Ordinances ("CSACO") (cumulatively, "Licensed Taxi Operators") (Chapter 46 of the CHCO and Chapter 33 of the CSACO are collectively referred to herein as the "Regulatory Framework").[1]

---

[1] The Cities promulgate the Regulatory Framework to incorporate the requirement of state law. *See* Texas Local Government Code § 215.004(a).

384154

2.     Defendants Uber and Lyft are transportation companies operating across the United States in interstate commerce who provide services through the use of a smartphone application designed to act as a means to dispatch their drivers to their customers through internet communications.

3.     Plaintiffs, as regulated providers of transportation services in Houston and San Antonio, have filed this suit seeking to put an end to the false advertising and unfair competition promoted by the Defendants throughout the United States, but in particular in relation to their improper activities in Houston and San Antonio.

## I. Parties

4.     Plaintiff Greater Houston Transportation Company ("GHTC") is a Texas Corporation with its principal place of business at 1406 Hays Street, Houston, Texas 77009, within the boundaries of the Southern District of Texas.  GHTC operates within the greater Houston area as: A Luxury United, United Cab, Greater Houston Airport Taxi, Towne Car, United Cab, and Yellow Cab.  GHTC presently owns approximately 1,287 taxicab permits issued by the City of Houston.

5.     Plaintiff Fiesta Cab Company ("Taxis Fiesta") is a Texas Corporation with its principal place of business at 1406 Hays Street, Houston, Texas 77009, within the boundaries of the Southern District of Texas.  Fiesta operates within the greater Houston area as Taxis Fiesta and as Fiesta Cab.  Fiesta presently owns approximately 159 taxicab permits issued by the City of Houston.

6.     Plaintiff Houston Transportation Services, LLC ("HTS") is a Texas limited liability company with its principal place of business at 5825 Kelley Street, Houston, TX 77026, within the boundaries of the Southern District of Texas.  HTS operates within the greater

2

Houston area as Lone Star Cab, Liberty Cab, and Square Deal Cab. HTS presently owns approximately 404 taxicab permits issued by the City of Houston.

7.      Plaintiff National Cab Co., Inc. ("National") is a Texas Corporation with its principal place of business at 1005 St. Emanuel #7, Houston, TX 77003, within the boundaries of the Southern District of Texas. National presently owns approximately 46 taxicab permits issued by the City of Houston.

8.      Plaintiff Pasadena Taxi Co., Inc. ("Pasadena") is a Texas Corporation with its principal place of business at 311 W. Shaw, Pasadena, TX 77506, within the boundaries of the Southern District of Texas. Pasadena operates within the greater Houston area as Pasadena Taxi. Pasadena presently owns approximately 16 taxicab permits issued by the City of Houston.

9.      Plaintiff Dawit Sahle ("DS") is a Texas sole proprietor with his principal place of business at 13114 Stratford Skies Lane, Houston, TX 77072, within the boundaries of the Southern District of Texas. DS operates within the greater Houston area as Adulis Cab Co. and as Adulis Cab. DS presently owns approximately 8 taxicab permits issued by the City of Houston.

10.     Plaintiff Mersha Ayele ("MA") is a Texas sole proprietor with his principal place of business at 9410 Heflin Colony, Sugar Land, Texas 77498, within the boundaries of the Southern District of Texas. MA operates within the greater Houston area as Bell Cab and as Bell Town Car. MA presently owns approximately 3 taxicab permits issued by the City of Houston.

11.     Plaintiff Mohamed Didi ("Shirdoon") is a Texas sole proprietor with his principal place of business at 14101 Rio Bonito, #278, Houston, TX 77083, within the boundaries of the Southern District of Texas. Shirdoon operates within the greater Houston area as Shirdoon Cab. Shirdoon presently owns approximately 1 taxicab permit issued by the City of Houston.

384154

12. Plaintiff Greater San Antonio Transportation Company ("GSATC") is a Texas Corporation with its principal place of business at 9600 IH 35 North, San Antonio, Texas 78233. GSATC operates within the greater San Antonio area as: Yellow Cab. GSATC presently owns approximately 539 taxicab permits and 30 town car services permits issued by the City of San Antonio.

13. Plaintiff Enterprise Transportation Inc. ("AAA") is a Texas Corporation with its principal place of business at 513 Paseo Canada St., San Antonio, Texas 78232. GSATC operates within the greater San Antonio area as: AAA Taxi. AAA presently owns approximately 42 taxicab permits issued by the City of San Antonio.

14. The 10 above named plaintiffs shall hereafter cumulatively be referenced as the "Plaintiffs." Collectively, the Plaintiffs hold approximately 1,924 taxi licenses in the City of Houston and 581 in the City of San Antonio.

15. Defendant Uber Technologies, Inc. is a foreign corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. Uber has appeared in this action. No further service is necessary.

16. Defendant Lyft Inc. is a foreign corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. Lyft has appeared in this action. No further service is necessary.

17. Uber and Lyft are referred herein collectively as the "Defendants."

## II. Jurisdiction and Venue

18. The District Court has Federal Question jurisdiction under 28 U.S.C. §1331 since this matter includes allegations related to a Federal statute. Specifically, the court has jurisdiction under 15 U.S.C. § 1121. The court has jurisdiction over the unfair competition

4

claims herein under the provisions of 28 U.S.C. § 1338(b) in that such claims are joined with a substantial and related claim under the Trademark Laws of the United States, 15 U.S.C. § § 1051 et seq. The court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367 since those claims are so related to other claims in this action that they form part of the same case or controversy.

19.     Venue is proper in the Southern District of Texas based on 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III. <u>Facts</u>

### A.     **Background**

20.     Plaintiffs are taxi service providers in Houston and/or San Antonio. Plaintiffs' business model is well known. Consumers can hail a cab on the street, call to arrange for pick up, or go online to arrange travel. In addition, for certain Plaintiffs, consumers can download the "Hail A Cab" smartphone app and locate, schedule, and track their vehicle service on their smartphone. Although there is not a formal written contract for the service, consumers enter into contracts and business relationships with Plaintiffs or their independent contract drivers whereby the consumer is transported to their desired location and the consumer agrees to pay the driver the published rate for the trip. Plaintiffs are authorized vehicle-for-hire service providers under the applicable local ordinances in Houston and San Antonio.

21.     Uber and Lyft entered the vehicle-for-hire market in both Houston and San Antonio.[2] Uber and Lyft customers use a smartphone app to locate, schedule, and pay for their

---

[2] Upon information and belief, sometime during the course of this litigation, Lyft ceased operations in Houston, then sometime later Lyft and Uber ceased operations in San Antonio, based on their adamant refusal to comply with local regulations, including but not limited to regulations regarding Insurance and Background Check requirements. It is believed that Lyft and Uber are now pursuing State legislation to change, reduce or eliminate such local regulation

travel.  Consumers enter into contracts and business relationships whereby Uber and Lyft transport the consumer(s) to their desired location and the consumer(s) agree to pay for the services with a credit card via their smartphone.  These charges may include safety fees, as well as "surcharge pricing" when the company chooses to do so.

22.     Because they were operating in violation of city ordinances, Uber and Lyft began lobbying efforts with the City of Houston, seeking to amend Houston ordinances to allow for their operation.  After numerous proposals and debate, an amendment was passed by Houston City Council on August 6, 2014.  Rather than comply with newly passed ordinance, Lyft decided to leave Houston as long as the new regulations remain in place.[3]  On the other hand, Uber remained in Houston, but have repeatedly ignored many of the permitting requirements and routinely encourage their drivers to do the same.  More than 740 citations have been written in 2015 alone in Houston for various violations related to Uber drivers carrying passengers without the proper permits or equipment.[4]

23.     Similarly, Uber and Lyft began operations in San Antonio in violation of known legal obligations, and even though the City of San Antonio amended its ordinances to allow companies like Uber and Lyft to operate, they each decided to leave San Antonio rather than submit to the regulations contained in the amended ordinance.[5]

**B.     Unfair Competition**

24.     To obtain consumer support for their illegal operations, Defendants have engaged

---

so they can reenter the Houston and San Antonio markets and again compete unfairly.  Nevertheless, upon information and belief, Defendants continue to compete unfairly as Lyft continues to operate in areas outlying Houston and San Antonio, while Uber continues to operate in areas outlying San Antonio.

[3] *See Exhibit 4:* http://www.houstonchronicle.com/news/transportation/article/Lyft-leaving-Houston-unless-new-rules-are-altered-5856803.php

[4] *See Exhibit 5:* http://www.houstonchronicle.com/news/transportation/article/Uber-driver-accused-of-rape-not-permitted-by-city-6182503.php

[5] *See Exhibit 6:* http://www.expressnews.com/news/local/article/City-Council-hears-pros-and-cons-about-rules-for-6116908.php

in a repeated pattern of deceit toward consumers. The misrepresentations that have been disseminated by Defendants with regard to the safety of their services, the insurance coverage provided, and the payment structures they employ, among others, harm the Plaintiffs by providing an uneven playing field in the marketplace, primarily in the form of misrepresentations and false advertising, designed to confuse and mislead consumers about Uber and Lyft services with the intent that consumers will choose their services over that of the Plaintiffs. These misrepresentations are particularly harmful in light of Uber and Lyft's repeated self-comparisons to taxicab transportation similar to the Plaintiffs. A few of these false representations are highlighted below.

    i. *Misrepresentation #1 – Safety (Uber & Lyft).*

    *(a) Uber's Safety Misrepresentations.*

25.    Uber's business model depends upon convincing its customers that it is safe to get into a stranger's car despite its admission, buried in its terms and conditions, that its customers "may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe or otherwise objectionable." In a successful effort to do so, Uber makes a number of representations, on its webpages, in communications with customers and in the media, designed to create the impression that Uber does everything it can to ensure its customers' safety. These include, but are not limited to, the representations set forth below.

**Uber's Representations Regarding the Superiority of Its Background Checks**

26.    As a large part of Uber's advertising campaign trumpeting its safety standards, Uber consistently (1) boasts about the purportedly rigorous background checks to which Uber drivers are subject, and (2) emphasizes the purportedly inferior background checks to which taxi cab drivers are subject.

27.     Under the tagline "SAFEST RIDE ON THE ROAD - Going the Distance to Put People First" on Uber's prominent "Safety" webpage, Uber represents that, "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road."[6]  Uber expands on this theme, explaining below the picture of a young girl riding in an Uber car, "That means setting the strictest safety standards possible, then working hard to improve them every day.  The specifics vary, depending upon what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security - and what we're doing in the US is an example of our standards around the world."[7]

28.     On the same webpage under the tagline, "RIDER SAFETY," Uber introduces the centerpiece of its advertising about customer safety and proclaims that Uber offers "**BACKGROUND CHECKS YOU CAN TRUST**."[8]  The website further states, "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using constantly improving standards... ."[9]  Uber's website previously boasted *even more emphatically* about its background checks, as the website stated, "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using *industry-leading* standards." (emphasis in italics added).

29.     Uber's blog currently elaborates on Uber's background check procedure. There, Uber's Head of Communications – North America, Lane Kasselman, states:

> All Uber ridesharing and livery partners must go through a rigorous background check. The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, *has set a new standard*. . . . We apply this *comprehensive and new industry standard* consistently across all Uber products, including uberX.

[6] *See Exhibit 7:* www.uber.com/safety
[7] *Id.*
[8] *Id.*
[9] *Id.*

384154

Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. *Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver.* (emphasis in italics added).[10]

30.     The prior version of the blog post stated, in part, even more emphatically that "[a]ll Uber ridesharing and livery partners must go through a rigorous background check *that leads the industry.*" (emphasis in italics added).

31.     In a transparent attempt to buy some credibility for its background check process, Uber hired former New York City Mayor Rudy Giuliani and his Giuliani Partners company to conduct an "independent" review of Uber's driver background check process.  In an October 29, 2014 post by Giuliani on Uber's blog, Uber further propagated the false representations previously made about their background checks.  According to the post, "Uber is setting the safety standard in the ride-sourcing industry" and that their process "represents a substantial improvement over the existing safety standards in the personal hire transportation world".[11] Uber continues to promote itself in comparison to taxis:

While GP's review is ongoing, it is already becoming clear that the Uber BGC process today is much more thorough than that of many companies conducting background checks in this industry. The normal criminal check by many taxi services in major cities is a 3 or 5 year background check compared to Uber's 7 year check; Uber's process is significantly, multi-dimensionally more thorough, and includes a review of driving records for the currently licensed state, a social trace to identify current and prior address, a multi-state criminal record review, a county criminal check for all counties in which the driver resided for the past seven years and a review of Federal criminal cases for all District courts where the driver resided for the past seven years.[12]

32.     Similarly, on the website purportedly justifying the $1 "Safe Rides Fee", Uber, represented, in part, that "[t]his Safe Rides Fee supports our continued efforts to ensure the safest

---

[10] *See Exhibit 8:* http://blog.uber.com/driverscreening
[11] *See Exhibit 9:* http://blog.uber.com/giuliani
[12] *Id.*

possible platform for Uber riders and drivers, including an industry-leading background check process."

33.     The website has since dropped the "industry-leading" language but still trumpets, in part: "This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers... ."[13]   The fact that Uber, as explained at various points throughout the Complaint, has downgraded the representations on its website about safety demonstrates that Uber itself realizes that those representations to the public were false and misleading at the time they were made.

**Uber's Representations Regarding Safety in Interactions with the Media**

34.     Uber has boasted to the media about the safety of Uber rides.   For example, Uber's Senior Communications Associate, Central North America, Lauren Altmin, issued a statement to NBC's Detroit affiliate which stated, in part, as follows:

> What I can tell you is that Uber takes passenger safety very seriously. We work every day to connect riders with the *safest rides on the road* and go above and beyond local requirements in every city we operate. Uber only partners with drivers who pass an *industry-leading screening* that includes a criminal background check at the county, federal and multistate level going back as far as the law allows. We also conduct ongoing reviews of drivers' motor vehicle records during their time as an Uber partner.
>
> . . . .
>
> For more information on what makes Uber *the safest rides on the road*, please see our website . . . . (emphasis in italics added).[14]

35.     Similarly, an April 29, 2014 article entitled "Faulty Background Checks May Put UberX Passengers at Risk, Report Says" quotes Uber's Head of Communications – North America, Lane Kasselman, as stating:

---

[13] *See Exhibit 10:* https://help.uber.com/h/4fa83c50-ab30-434c-b911-f63ad11cd4d9
[14] *See Exhibit 11:* http://www.clickondetroit.com/news/local-4-defenders-is-uberx-safe/26944252

Uber's industry-leading background checks help connect consumers with the safest ride on the road . . . . Our driver partner background checks are more thorough than those of taxi [sic] in most cities . . . . We continue to improve and are always working hard to tighten our policies and processes to ensure that Uber remains the safest transportation option available.[15]

36.     Similarly, in an April 24, 2014, NBCBayArea.com news report, Uber's Head of Communications – North America, Lane Kasselman, is quoted as saying, "We're confident that every ride on the Uber platform is safer than a taxi."[16]

*Uber's Representations About The Safe Rides Fee*

37.     Uber reinforces the message about its efforts to ensure customer safety and the quality of its background checks when it charges customers a $1.00 "Safe Rides Fee," which is separately itemized on the electronic receipt sent to the customer.

38.     Whenever a United States Uber customer uses UberX, they, at the completion of their ride, receive an automatically generated e-mail from Uber that contains their bill for their transportation.  This bill includes a fare breakdown (including calculations for, amongst other components of the bill, "Base Fare" and "Distance").  The bill also includes a $1.00 fee labeled as the "Safe Rides Fee."

39.     Customers see a small, hyperlinked question mark (?) next to the word "Safe Rides Fee," inviting customers to click on the link to learn about the justification for the extra $1.00 "Safe Rides Fee" that customers are being charged to travel via UberX.

40.     Beginning with Uber's April 2014 introduction of the "Safe Rides Fee", the hyperlink connected to the following explanation stating that the fee is used to support, among other things, "an industry-leading background check process."  In October of 2014, Uber changed the words "industry-leading" to "a Federal, state, and local background check," Uber

---

[15] *See Exhibit 12:* http://mashable.com/2014/04/29/uberx-passengers-risk/
[16] *See Exhibit 13:* http://www.nbcbayarea.com/investigations/Is-Uber-Keeping-Riders-Safe-256438921.html

384154

continues to represent to the public that it is committed to rider safety, claiming that the Safe Rides Fee "supports continued efforts to ensure the safest possible platform for Uber riders and drivers ...."[17]

41.     When customers click on this hyperlink today, they are directed to an Uber-operated internet site, which provides the purported explanation for the "Safe Rides Fee." That website states, in part, as follows:

**What Is The Safe Rides Fee?**

From the beginning, we've always been committed to connecting you with the safest rides on the road. The Safe Rides Fee is a fee added to uberX fares on behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers . . . . For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

42.     In the U.S., the Safe Rides Fee is always $1 USD. In Canada, it is $1 CAD. These statements actually deceive, or have the tendency to deceive, customers into believing that riders who pay this $1 per ride fee to use UberX are being transported on the "safest possible platform."

43.     Similarly, these statements actually deceive, or have the tendency to deceive, customers into believing that riders who pay this $1 per ride fee to use UberX are safer than if they chose transportation via a taxi cab.  Because this "Safe Rides Fee" is a separate line item on the receipt that Uber issues to customers, this bolsters the consumers' expectation that they should be receiving the safest ride possible. Put differently, considering that Uber explicitly specifies that

this is an *additional* safety fee, it is reasonable for consumers to expect that they will be receiving a ride safer than that provided by Plaintiffs' taxi cabs, as Plaintiffs' taxicabs simply charge a total fare, without imposing any additional surcharge to ensure a "Safe

---

[17] *See Exhibit 10:* https://help.uber.com/h/4fa83c50-ab30-434c-b911-f63ad11cd4d9

Ride."

44.     The statements also explicitly represent to consumers that the entirety of each $1 "Safe Rides Fee" earned by Uber goes towards ensuring the safety of Uber riders and drivers, as opposed to towards Uber's bottom line or some other aspect of the company.

45.     On information and belief, the entirety of each $1 "Safe Rides Fee" earned by Uber does not go towards ensuring the "safest rides on the road." Data from as far back as 2013—when Uber was not as prevalent as it is today—shows that Uber was completing approximately 800,000 trips a week – or over *41 million* trips per year.  Now, in 2015, Uber and UberX are more financially successful than ever.  Accordingly, it is clear that Uber is making an enormous sum of money from the "Safe Rides Fee" that it tacks on to *every single* UberX ride it provides. Given the comparatively inadequate safety measures that Uber has in place (as explained in detail below), Uber is not, on information and belief, spending the entirety of the millions upon millions of dollars that it receives in "Safe Rides Fees" on safety measures.

**The Truth about Uber's Safety**

46.     The representations made by Uber set forth in the foregoing paragraphs are untrue or misleading in violation of Federal law.  Viewed separately or together, the representations are likely to mislead consumers into believing that Uber does everything it can to ensure their safety when, in fact, the centerpiece of Uber's customer safety assurances - the background check process Uber describes as "industry-leading" and touts as "often more rigorous than what is required to become a taxi driver" - does not use fingerprint identification and therefore cannot ensure consumers and others that the information Uber obtains from a background check actually pertains to the applicant.

47.     Instead, of using fingerprints, Uber's background check process relies upon its

drivers to submit personal identifiers (name, address, driver's license number and state, and social security number) through an online webpage. Uber provides this information to third-parties like Hirease, Inc., a private company that performs its background checks. This process cannot ensure that the information in the background check report is actually associated with the applicant since it does not use a unique biometric identifier such as a fingerprint. In fact, the sample report Hirease posts on its website has a disclaimer stating, "Final verification of an individual's identity and proper use of report contents are the user's responsibility."

48.     A supposed tough on crime former Mayor like Mr. Giuliani knows that his words regarding Uber's flawed background check process are misleading. He knows from personal experience that no matter how far a background check looks back, it is simply worthless if you cannot verify that the person seeking the license is actually the person whose background you are checking. In fact, one of his first actions as the Mayor of New York City was to implement background and fingerprint checks on merchants, employees and unions at the Fulton Fish Market, where the mafia had been entrenched for years. Thereafter he instituted and stepped up fingerprinting requirements in numerous other industries, including Taxi and Limousine operations. Simply put, he should know better.

49.     Some states, such as California, require background check companies to include on the first page of every background check report a notice, in at least 12-point boldface type, setting forth that "the report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report."

50.     Because of the unique identifying characteristics of fingerprints, a background

14

check utilizing fingerprinting as one of its requirements provides assurances that the person whose criminal history has been run is, in fact, the applicant. Otherwise a registered sex offender could simply use his law-abiding brother's identification information to become an Uber driver, or a convicted burglar could borrow his cousin's identification information to become an Uber driver in order to case the empty homes of customers he takes to the airport.

51.     Uber's own background check provider, Hirease, explains why a fingerprint-based background check process is far superior: "Fingerprinting helps uncover criminal history not discovered through traditional methods, offers extra protection to aid in meeting industry guidelines, and helps prevent fraud."[18]

52.     Uber's representations concerning the quality of its background check process are untrue or misleading. Contrary to Uber's multiple representations that it employs "background checks you can trust," that it uses a background check process that "leads the industry," and that its background check process is "often more rigorous than what is required to become a taxi driver," Uber's background check process does not provide the level of security provided by fingerprint-based process employed for performing background checks on taxi drivers throughout the country, including San Antonio and Houston.

53.     In fact, when the District Attorneys for the City of San Francisco and the County of Los Angeles joined together to sue Uber for making false representations about its safety measures and background checks, Uber filed a motion to dismiss the suit claiming that its representations were "classic, non-actionable puffery", which generally means a broad, vague exaggeration or boast on which no reasonable consumer would rely. It seems Uber is admitting its safety claims are simply exaggerations. Yet, Uber uses direct comparisons to taxis in order to bolster their claims.

---

[18] *See Exhibit 14:* http://www.hirease.com/fingerprinting/

54.     In contrast to Uber's policies, taxi regulations in Houston and San Antonio require drivers to be licensed, submit applications, and undergo criminal background checks using fingerprint identification from approved sources, among other requirements. The fingerprints allow for a biometric search of criminal history databases. Similar requirements would be required of Uber and Lyft in Houston and San Antonio, though each of them threatened to leave town over regulatory changes that occurred of late. Upon information and belief, Uber has left San Antonio, but continues to operate in Houston. However, it is believed that even when Uber or Lyft "leave" a city, they continue to operate in areas outlying the city in competition with the Plaintiffs.

55.     Though it is believed Uber has been licensed to operate in Houston, many of its drivers are driving without such approval. That means Uber has drivers picking up passengers all over Houston and surrounding areas that have never been subject to city mandated application and background check requirements other than the misrepresented processes Uber itself employs as discussed above. In fact, Uber continues to tell its drivers and potential drivers that they can go ahead and start driving before receiving a proper permit to do so, and that in the interim, Uber will pay for any tickets they receive for up to three weeks.

56.     When an Uber driver was recently arrested for sexually assaulting a passenger, the ugly reality of Uber's flawed safety and background check process came to light for many Houstonians. Uber driver Duncan Eric Burton, who had been released from federal prison in 2012 after 14 years behind bars, had apparently been driving for Uber for months without applying for a permit from the City of Houston and apparently without Uber doing anything to see that he had done so.[19] At the same time, an Uber spokesperson admitted that Burton did not

---

[19] *See Exhibit 15:* http://www.houstonchronicle.com/news/transportation/article/Uber-driver-accused-of-rape-started-work-after-14-6185342.php

have a city permit and had passed Uber's "more rigorous than a taxi driver" background check.[20]
How could such a person pass an "industry leading" background check?  Well, Burton's record
was clear for the last seven years, apparently due to the fact that he was locked-up for most of
those seven years.[21]  In fact, he had already been in jail for about 7 years already by the time the
first IPhone was released by Apple in 2007.  According to the City of Houston, had Burton
actually applied for a permit, its background check and fingerprint process would have caught
his prior conviction and would have prevented him from picking up passengers, including the
eventual rape victim.[22]

57.    The City of Houston has further complained of Uber's own flawed checks,
claiming they don't even search records for the state of Wyoming, and that they fail to check the
use of aliases.[23]  The City has reported numerous examples of drivers who have been discovered
with significant criminal histories not caught by Uber's checks, including indecent exposure,
DWI, possession of a controlled substance, prostitution, fraud, battery, assault, robbery,
aggravated robbery, possession of marijuana, theft, sale of alcohol to a minor, traffic of
counterfeit goods, trademark counterfeit, possession of narcotics, and driving with a suspended
license.[24]  In fact, one example they cite was a driver who had been cleared by Hirease who was
discovered under Houston's background check that she had 24 alias names, 5 listed birth dates,
10 listed Social Security numbers, and an active warrant for arrest.[25]  Without a fingerprint check
that would pull the records for the various aliases of an applicant with this type of suspect
history, the background check performed by Uber is simply worthless.

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *See Exhibit 16:* http://www.chron.com/news/transportation/article/How-Uber-driver-eluded-background-check-process-6186467.php
[24] *Id.*
[25] *Id.*

384154

58.     Yet, despite the obvious flaws in their checks, Uber continues to represent to consumers that their process is better than what taxi drivers submit to, which is an outright falsehood.  Uber continues to promote the mantra that they are all about safety, when their actions reveal otherwise.   They continue to fight at every level of government against fingerprinting and background checks, against insurance that protects the public, and against any and all regulation of their practices, including regulations similar to what taxis and taxi drivers have been subject to for years.  In fact, after Houston and San Antonio passed ordinances with fingerprint background check requirements, Uber hired teams of lobbyists to descend upon the state capitol at the start of the legislative session and are seeking to have a state-wide statute passed that will require nothing more of "TNC's" than the current substandard non-fingerprint background checks that have allowed so many criminals to drive for them already.  Under those circumstances it's probably safe to assume that if Charles Manson ever convinces a parole board to let him out of prison, he should feel relieved that he will have no problem passing Uber's background check.

**Uber's Misleading Statements In Response To Incidents Involving Its Drivers**

59.     During the past year, Uber has consistently repeated its misleading statements about the quality of its background checks and commitment to safety in response to a series of well- publicized incidents involving Uber drivers.

60.     In January 2014, online news site PandoDaily.com reported that an Uber driver in San Francisco who had been accused of verbally and physically assaulting a passenger had a significant criminal history which should have disqualified him from becoming an Uber driver.[26] In June 2014, Forbes.com reported that the driver had been on probation for a battery conviction

---

[26] *See Exhibit 17:* http://pando.com/2014/01/06/exclusive-uber-driver-accused-of-assault-passed-zero-tolerance-background-check-despite-criminal-history/

when Uber hired him in October 2013.[27]

61.     On December 31, 2013, an Uber driver struck and killed a six-year-old girl while driving in San Francisco. In response to the incident, the next day Uber posted a "Statement on New Year's Eve Accident" on its blog in which the company represented, "We are committed to improving the already best in class safety and accountability of the Uber platform, for both riders and drivers." Two weeks after Uber made its statement, it was reported that the driver had been convicted of reckless driving in Florida in September 2004.[28]  An Uber, spokesperson told NBC Bay Area News that "Uber works with Hirease to conduct stringent background checks going back seven years, which all drivers must undergo and clear to partner with Uber.  This driver had a clean background check when he became an Uber partner."[29]  In February 2014, the Chicago Tribune reported that a 24-year-old Uber driver had a felony conviction for residential burglary in 2010, a misdemeanor conviction for criminal damage to property in 2009, another misdemeanor conviction in 2008 for breaking into a car to steal a GPS and satellite radio receiver, a history of speeding tickets, and had his license suspended twice in 2008.[30]  Uber posted an apology on its website: "[W]e have already taken steps to prevent this from happening again, by expanding our background check process to set new industry-leading standards ... We are sincerely sorry for this error, and want to assure all riders that we are taking the necessary steps to fix it and build the safest option for consumers."[31]  Yet, they did not takes steps to prevent this from happening, as it continues to happen at record pace as they expand their

---

[27] *See Exhibit 18:* http://www.forbes.com/sites/ellenhuet/2014/06/03/uber-driver-with-felony-conviction-charged-with-battery-for-allegedly-hitting-passenger/
[28] *See Exhibit 19:* http://www.nbcbayarea.com/news/local/UberX-Driver-Involved-in-New-YEars-Eve-Manslaughter-Had-A-Record-of-Reckless-Driving-240344931.html
[29] *Id.*
[30] *See Exhibit 20:* http://articles.chicagotribune.com/2014-02-14/news/ct-rideshare-background-checks-met-20140214_1_background-checks-ride-sharing-drivers/2
[31] *See Exhibit 21:* http://articles.chicagotribune.com/2014-02-14/news/chi-uber-apologizes-for-missing-conviction-in-check-of-driver-20140214_1_chicago-tribune-driver-background

operations.  Claims to build the safest option for consumers is a stark contrast from their adamant stance against background checks involving fingerprinting or the simple fact that they do not look at a full criminal history sufficient to tell if their driver has been in jail for the last 14 years.

62.    Two months later, on April 24, 2014, an NBC television affiliate in Los Angeles aired an investigative report about Uber's driver background checks in which the station enlisted a woman to apply to become an Uber driver.[32]  She was on felony probation for making criminal threats (willfully threatening to commit a crime which will result in death or great bodily injury to another person), and during the broadcast described the conduct leading to her arrest: "I pulled a girl out of a car and almost beat her to death."[33]  On March 3, 2014, Uber sent the woman an email notifying her that she passed her background check.  According to the NBC report, Uber would not respond to the station's request for comment about this case. Instead, Uber spokesperson Lane Kasselman sent an email explaining Uber's background screening policy. The email ended with, "We're confident that every ride on Uber is safer than a taxi."[34]  In July 2014, WDIV-TV 4 in Detroit broadcast a segment on an investigation it had performed in which it found Uber drivers who had previously had their licenses suspended, Uber drivers who had been in a serious accident with injuries, Uber drivers with speeding tickets, Uber drivers who been cited for no proof of insurance, and Uber drivers who were driving vehicles registered to other people.[35]  In response to the report, Uber spokesperson Lauren Altmin issued this statement: "We work every day to connect riders with the safest rides on the road and go above and beyond local requirements in every city we operate. Uber only partners with drivers who pass an industry-leading screening that includes a criminal background check at the county,

---

[32] *See Exhibit 22:* http://www.nbclosangeles.com/news/local/Risky-Ride-Uber-Investigation-256604571.html
[33] *Id.*
[34] *Id.*
[35] *See Exhibit 11:* http://www.clickondetroit.com/news/local-4-defenders-is-uberx-safe/26944252

federal and multi-state level going back as far as the law allows. We also conduct ongoing reviews of drivers' motor vehicle records during their time as an Uber partner.... For more information on what makes Uber the safest rides on the road, please see our website: https://www.uber.com/safety."[36]

63.     Uber's response to well-publicized incidents involving its drivers is to repeat its misleading mantra about the quality of its background check process, and to continue to assure the public that it does everything it can to ensure its customers' safety.  Uber continues to repeat its claims that it aims "to go above and beyond local requirements to ensure your comfort and security," that it "is committed to connecting you to the safest ride on the road," that it makes "continued efforts to ensure the safest possible platform for Uber riders," and that it goes "above and beyond local requirements in every city we operate."

64.     These representations are untrue or misleading.  Uber spends millions of dollars on lawyers and lobbyists to stop and impede regulators from passing even the most basic safeguards against the rapes, beatings, and deaths that have already occurred in the relatively short time they have been operating.

*(b) Lyft's Safety Misrepresentations.*

65.     Much like Uber, Lyft focuses on convincing the public that it is safe to hitchhike, i.e. get into a stranger's car (or as Lyft likes to say "community driver"), despite its own broad disclaimers of responsibility of what might happen in that car, including damages incurred by a passenger such as "PHYSICAL DAMAGES, BODILY INJURY, DEATH AND OR EMOTIONAL DISTRESS AND DISCOMFORT."[37]  As a result, Lyft has made a number of representations on its webpages, and in communications with customers and in the media

---

[36] *Id.*
[37] *See* Spears Exhibit H (Lyft Terms of Service).

designed to create the false impression that Lyft does everything it can to ensure its customers' safety. These include, but are not limited to, the representations set forth below.

**Lyft Misrepresentations of Safety**

66.     After Lyft began operating in Houston without any authority to do so, the City of Houston attempted to warn consumers to question Lyft's safety.[38]  In response, Lyft continued to follow its game plan of touting its own safety in comparison to Houston taxi services such as the Plaintiffs.  Lyft spokeswomen Paige Thelen said  "In no way does this isolated error speak to the quality of Lyft's background check, driving record check and other safety standards, all of which remain more strict than what's currently required of taxis and limos in Houston."[39]

67.     Lyft claims that "Safety and comfort are our top priorities"[40]

Safety and comfort are our top priorities. While we strive to create a fun and relaxed atmosphere, we remind all our community members that nothing is more important than the safe and timely arrival of all our Lyft rides to their destination. From background checks to our first-of-its-kind $1M liability insurance, our safety standards cover a number of bases. Our safety measures include:

- Criminal background checks
- DMV checks
- Vehicle inspections
- Primary liability insurance coverage
- Zero-tolerance drug and alcohol policy
- Star rating system

68.     Lyft has represented that its background check process screens out drivers with any history of violent crimes, sexual offenses, theft, property damage, felonies, or drug related offenses when, in fact, the background check process they utilize only provides them information

---

[38] *See Exhibit 23:* http://www.bizjournals.com/houston/morning_call/2014/03/city-issues-safety-warning-for-those-using-lyft.html
[39] *Id.*
[40] *See Exhibit 24:* https://www.lyft.com/help/article/1003526; *see also Exhibit 25:* http://blog.lyft.com/posts/drivingyouhappy?rq=safety%20fee

for limited duration and without assurance that the Lyft driver has never been convicted of these offenses.

69.     For the same reasons stated above about Uber's lack of fingerprinting, Lyft's lack of a fingerprint background check also fails to ensure the public that the flawed background check they actually perform was done for the person who is actually driving, and not the driver's friend, brother, or someone whose identity the Lyft driver has stolen.

70.     Lyft makes these representations while at the same time comparing themselves constantly to taxi service, e.g. "Lyft is a great alternative to traditional taxi or formal transportation services when you want a ride that is safe, friendly and fun."[41]  Lyft also compares the features of its background check process to those required of taxis, and in many instances claims their process is either more thorough or more stringent, which is clearly untrue as discussed herein given the inaccuracies of third-party background checks and lack of biometric searches in Lyft's process, as opposed to a fingerprint check of DPS and FBI records.  Lyft does not use fingerprints or any other form of biometric identification.  In fact, Lyft's terms and conditions state: "Lyft may but has no responsibility to screen or otherwise evaluate potential riders or users".[42]  Like, Uber, Lyft also charges a safety fee which is misleading for the same reasons as Uber's fee.[43]

71.     Like Uber, the District Attorneys for the City of San Francisco and the County of Los Angeles joined together to also sue Lyft for making false representations about its safety measures and background checks.  As a result, Lyft agreed to a permanent injunction stating in part:[44]

---

[41] *See Exhibit 26:* https://www.lyft.com/help/article/1450425
[42] *See* Spears Exhibit H (Lyft Terms of Service).
[43] *See Exhibit 27:* https://www.lyft.com/help/article/1400238
[44] *See Exhibit 28:* (Agreed Injunction).

3    A. Defendant shall not make any false or misleading representation, expressly or by

4 implication or material omission, to any consumer, whether in the form of a comparison or

5 otherwise, regarding the California Background Checks.

6    B. In any representation made by Defendant to consumers regarding the California

7 Background Checks:

8    (1) Defendant shall not list any offense type that does not result in automatic

9 disqualification as a Lyft driver.

10    (2) Defendant shall not represent that it screens against arrests for any instances

11 where Defendant actually screens only against convictions.

12    (3) Defendant shall identify the time period covered by its background check

13 report or, if shorter, any time period used for disqualification purposes.

14    C. Defendant shall not use terms such "best available," "industry leading," or "gold

15 standard," in connection with any description of the California Background Checks, or in

16 connection with any description of its efforts to ensure rider safety which expressly or by

17 implication includes or refers to the California Background Checks, unless Defendant utilizes the

18 most comprehensive and technologically advanced background check process that is available to

19 screen drivers of vehicles for hire anywhere in California.

72. Lyft's false advertising about its background check process isn't any truer in Texas than it is in California.

**Uber and Lyft's Lobbying Efforts Show their True Lack of Conviction for Safety**

73. After Houston City Council passed sweeping changes to allow the entry of companies like Uber and Lyft into the market, the companies claimed victory in the press then immediately resisted the requirements that were contained in the new ordinances. Lyft threatened to leave (and upon information and belief eventually did leave) Houston because it did not want to use the fingerprint-based background check procedures required by the new ordinances, procedures which taxi cab drivers have followed for years.[45] Lyft claimed, "We

---

[45] *See Exhibit 4:* http://www.houstonchronicle.com/news/transportation/article/Lyft-leaving-Houston-unless-new-rules-are-altered-5856803.php

have found a more efficient way to do these things", but apparently that simply meant it is more efficient for the bottom line of Lyft to not do them.[46] Uber remained in Houston, but as discussed above, it is readily apparent that Uber is not following the rules anyway, so to Uber, regulation of safety is apparently meaningless.

74.     In San Antonio, Uber and Lyft again threatened to leave town if the City did not capitulate to their ransom demands, which included less extensive background checks without fingerprinting.[47]  Even after the City made changes to their ordinance, it is believed that Uber and Lyft left town rather than submit their drivers to fingerprinting.

75.     After the City of Houston and San Antonio took a stand on safety that was apparently over the line for two companies who routinely promote themselves as having a "safety first" goal, Uber and Lyft took their armies of lobbyists to Austin in order to convince legislators at the state level to relax their operating requirements.  HB 2440 has now been introduced at the behest of Uber and Lyft, and purports to take all authority for governing "TNC's" away from municipalities in favor of the Texas Department of Motor Vehicles.[48]  HB 2440 also proposes to relax operating requirements for Uber and Lyft, including, among other things, allowing them to control the approval process for their drivers and conduct their own background checks which, you guessed it, do not require fingerprinting.[49]  In fact, the bill specifically states that a municipality or other local entity may not "subject a transportation network company or transportation network driver to the municipality's or other local entity's rate, entry, operational, or other requirements."[50]

---

[46] *Id.*
[47] *See Exhibit 6:* http://www.expressnews.com/news/local/article/City-Council-hears-pros-and-cons-about-rules-for-6116908.php
[48] *See Exhibit 29* (HB 2440).
[49] *Id.*
[50] *Id.*

76.     A passage of HB 2440, if the Uber and Lyft special interests succeed over common sense, is not the point and does not impact the Plaintiffs' claims.  Whatever state or local rules Uber and Lyft are subject to following does not change the fact that they have and continue to make representations to the public that are not true. That they would even seek such legislation is highly relevant though and further demonstrates the falseness of Uber and Lyft's repeated efforts to convince consumers of the safety of their services.

ii. *Misrepresentation #2 – Insurance or Lack Thereof (Uber & Lyft).*

77.     Uber and Lyft misrepresent their available insurance coverage in an attempt to lure customers to their service and undermine Plaintiffs' business.

(a)     Uber's Misrepresentations

78.     Uber represents:

> 1. At minimum, there will be a $1,000,000 per-incident insurance policy applicable to ridesharing trips. This insurance applies to any ridesharing trip requested through the Uber technology platform.

This representation is what currently appears on Uber's website.[51]  Yet, prior versions of the same post read a bit different:[52]

> 1. At minimum, there will be a $2,000,000 insurance policy applicable to ridesharing trips. This insurance applies to any ridesharing trip requested through the Uber technology platform.

With the stroke of a few keys, passengers appear to have lost half of the claimed insurance coverage.  Regardless, Uber's alleged coverage is illusory and never really existed in the first place.  Plaintiffs have sought the help of insurance experts to review the claims of the

---

[51] http://blog.uber.com/2013/04/12/uber-policy-white-paper-1-0/ (last visited May 9, 2014); *see also* Spears Ex. D.
[52] *See* Serio Report.

Defendants and determine from the few documents that have been made public whether or not the Defendants actually provide anything close to what they claim.

79. The policy that Uber at long last disclosed, after being forced by regulators to justify their claims, appears to be an excess and surplus lines policy, whose market is "one that is subject to a bare minimum of insurance regulation, as opposed to traditional personal, taxi/livery or commercial auto insurance policy, which are heavily regulated by State authorities for pricing, policy scope and language and unfair claim settlement protections."[53] Further, Uber's insurer, James River Insurance Company, is not authorized to issue insurance in the form of commercial auto liability coverage in the State of Texas.[54] Yet, even if they were authorized, it appears there would be no coverage under the policy.[55]

80. The James River policy actually insures Rasier, LLC, an apparent subsidiary company of Uber and an entity largely unknown to the end user of Uber's services.[56] It appears that the coverage in the policy is only applicable if Rasier is found liable to the third party for the injuries sustained in the accident.[57] Given the unclear role of Rasier in the process of retaining and operating the ride referral system, it is difficult to imagine how a driver or a passenger would be able to prove that Rasier was responsible for the injuries sustained in an accident.[58]

81. Uber is inappropriately marketing its James River policy as covering both drivers and passengers which are doing business with Uber.[59] This is not only clear from the plain meaning reading of the policy language, but given the lower level of regulatory oversight for the excess and surplus lines market, individuals may experience difficulty should the circumstances

---

[53] *See* Serio Report.
[54] *See* Vaught Affidavit.
[55] *See* Serio Report.
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*

arise that the individual may have to attempt to file a claim against such ill-fitting insurance, and both the passenger and driver would face an extraordinarily difficult legal challenge to ever have the chance to hold Uber or its insurance policy responsible.[60]

82.     Yet, Uber says the following on its website: "LICENSED & INSURED - From insurance to background checks, every driver meets all local regulations."[61]  Uber also represents that their "ridesharing transportation partners carry best-in-class commercial insurance coverage in the event of an accident", that the "vast majority of personal insurance policies cover" the period when an Uber driver is not on an actual trip,[62] and that, in addition to Uber's "corporate insurance policy," "all Uber rides are backed by the driver's insurance policy."[63]  In truth, most, if not all personal automobile insurance policies exclude coverage for commercial operations.[64]  Yet, Uber continues to make comparisons between itself and Taxis in Houston, among other things claiming "20x the requirements taxis have in Houston."[65]

(b)     Lyft's Misrepresentations

83.     Lyft claims "From background checks to our first-of-its-kind $1,000,000 liability insurance, we go above and beyond to create a more safe community."[66]  Yet, Lyft does not publicly disclose the full contents of its insurance policy, only a 1 page declaration page that leaves out the actual policy language.  Upon information and belief, the Lyft insurance policy has also been misrepresented in that Lyft is believed to maintain similar policies as Uber, and is believed to use the same insurer, James River Insurance Company, which is not authorized to

---

[60] *Id.*
[61] https://www.uber.com/drivers; *see also* Spears Ex. F6.
[62] http://blog.uber.com/uberXridesharinginsurance; *see also* Spears Ex. F7.
[63] http://blog.uber.com/2014/02/21/52133/; *see also* Spears Ex. F1.
[64] *See* Vaught Affidavit.
[65] *See Exhibit 30:* http://blog.uber.com/HOUinsurance
[66] http://www.lyft.me/safety; *see also* Spears Ex. I10.

issue insurance in the form of commercial auto liability coverage in the State of Texas.[67]  Yet, even if they were authorized, it appears there would be no coverage under the policy, for the same reasons as cited with Uber's policy above.[68]  Yet, Lyft routinely compares its alleged insurance to that of taxicabs, claiming to have more coverage of course.

84.     Upon information and belief, Defendants' misrepresentations deceive and confuse consumers of vehicle-for-hire services.  These representations are literally false.  As a result, Defendants receive the benefit of sales and profits that they should not have absent their material misrepresentations.     Defendants'  misrepresentations  that  they  are  properly  insured  sway consumers of vehicle-for-hire services to use their services, resulting in damages to the Plaintiffs and competitive injury.

(c)     Disclaimers Moot Insurance Coverage

85.     Whatever insurance they actually have is mooted by Uber's and Lyft's disclaimers of all responsibility for their actions (contrary to their marketing campaign), with the following broad disclaimers (plus others more fully discussed below):

Uber:[69]

---

[67] *See* Vaught Affidavit.
[68] *See* Serio Report.
[69] *See* Spears Exhibit E (Uber Terms of Service).

384154

THE COMPANY MAY INTRODUCE
YOU TO THIRD PARTY
TRANSPORTATION PROVIDERS FOR
THE PURPOSES OF PROVIDING
TRANSPORTATION. WE WILL NOT
ASSESS THE SUITABILITY, LEGALITY
OR ABILITY OF ANY THIRD PARTY
TRANSPORTATION PROVIDERS AND
YOU EXPRESSLY WAIVE AND
RELEASE THE COMPANY FROM ANY
AND ALL ANY LIABILITY, CLAIMS OR
DAMAGES ARISING FROM OR IN ANY
WAY RELATED TO THE THIRD PARTY
TRANSPORTATION PROVIDER. YOU

Lyft:[70]

Lyft has no responsibility whatsoever for the actions or conduct of drivers or riders. Lyft has no obligation to intervene in or be involved in any way in disputes that may arise between drivers, riders, or third parties. Responsibility for the decisions you make regarding providing or accepting transportation rest solely with You. It is each rider and driver's responsibility to take reasonable precautions in all actions and interactions with any party they may interact with through use of the services. Lyft may but has no responsibility to screen or otherwise evaluate potential riders or users. Users understand and accept that Lyft has no control over the identity or actions of the riders and drivers, and Lyft requests that users exercise caution and good judgment when using the services. Drivers and riders use the services at their own risk.

---

[70] *See* Spears Exhibit H (Lyft Terms of Service).

86.     These legal disclaimers are buried in the fine print of Uber's and Lyft's smartphone consummated contracts with consumers, and are used by them to defend against claims of liability by those persons injured by Uber and Lyft drivers.  As a result, even if it is technically true that they have insurance policies with policy limits of $1,000,000.00, the truth is that the coverage is limited to what Uber and Lyft would be liable for in the case of an injury, and based on the disclaimers, that could be severely limited or non-existent.

(d)     No Insurable Interest

87.     Finally, in order for Uber and Lyft's insurance to hold any water with respect to the activities of their drivers, i.e. their "third party providers", there must exist an insurable interest held by Uber and Lyft.  The purpose of the insurable interest requirement is to discourage the use of insurance for illegitimate purposes. *See First Preferred Ins. Co. v. Bell,* 587 S.W.2d 798, 802 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.).

88.     To find an insurable interest in an automobile under a liability insurance police, Uber and Lyft would have to establish an interest in the maintenance, possession, or use of the vehicle. *See Gulf Insurance Co. v. Winn,* 545 S.W.2d 526, 528 (Tex. Civ. App.—San Antonio 1976, writ ref'd n.r.e.).

89.     One would think that this would be a burden that Uber and Lyft would readily meet.  After all, do not each of them repeatedly profess their concern for safety, whether it be the safety of the vehicles they send to their customers or the drivers in those vehicles? Unfortunately, when it comes time to take legal responsibility for an injured party, their professed claims in advertisements apparently give way to the old saying *caveat emptor*.  A brief review of some of the terms and conditions found in the fine print of Uber and Lyft's terms of service, over and above the broad disclaimers already mentioned above, proves instructive:

Uber:[71]

THE COMPANY DOES NOT PROVIDE TRANSPORTATION SERVICES, AND THE COMPANY IS NOT A TRANSPORTATION CARRIER. IT IS UP TO THE THIRD PARTY TRANSPORTATION PROVIDER, DRIVER OR VEHICLE OPERATOR TO OFFER TRANSPORTATION SERVICES WHICH MAY BE SCHEDULED THROUGH USE OF THE APPLICATION OR SERVICE. THE COMPANY OFFERS INFORMATION AND A METHOD TO OBTAIN SUCH THIRD PARTY TRANSPORTATION SERVICES, BUT DOES NOT AND DOES NOT INTEND TO PROVIDE TRANSPORTATION SERVICES OR ACT IN ANY WAY AS A TRANSPORTATION CARRIER, AND HAS NO RESPONSIBILITY OR LIABILITY FOR ANY TRANSPORTATION SERVICES PROVIDED TO YOU BY SUCH THIRD PARTIES.

…

**THE QUALITY OF THE TRANSPORTATION SERVICES SCHEDULED THROUGH THE USE OF THE SERVICE OR APPLICATION IS ENTIRELY THE RESPONSIBILITY OF THE THIRD PARTY PROVIDER WHO ULTIMATELY PROVIDES SUCH TRANSPORTATION SERVICES TO YOU. YOU UNDERSTAND, THEREFORE, THAT BY USING THE APPLICATION AND THE SERVICE, YOU MAY BE EXPOSED TO TRANSPORTATION THAT IS POTENTIALLY DANGEROUS, OFFENSIVE, HARMFUL TO MINORS, UNSAFE OR OTHERWISE OBJECTIONABLE, AND THAT YOU USE THE APPLICATION AND THE SERVICE AT YOUR OWN RISK.**

Lyft:[72]

LYFT DOES NOT PROVIDE TRANSPORTATION SERVICES, AND LYFT IS NOT A TRANSPORTATION CARRIER. IT IS UP TO THE DRIVER OR VEHICLE OPERATOR TO DECIDE WHETHER OR NOT TO OFFER A

---

[71] *See* Spears Exhibit E (Uber Terms of Service); *see also* *https://www.uber.com/legal/usa/terms*
[72] *See* Spears Exhibit H (Lyft Terms of Service); *see also* *https://www.lyft.com/terms*

RIDE TO A RIDER CONTACTED THROUGH THE LYFT PLATFORM, AND IT IS UP THE RIDER TO DECIDE WHETHER OR NOT TO ACCEPT A RIDE FROM ANY DRIVER CONTACTED THROUGH THE LYFT PLATFORM. ANY DECISION BY A USER TO OFFER OR ACCEPT TRANSPORTATION ONCE SUCH USER IS MATCHED THROUGH THE LYFT PLATFORM IS A DECISION MADE IN SUCH USER'S SOLE DISCRETION. LYFT OFFERS INFORMATION AND A METHOD TO CONNECT DRIVERS AND RIDERS WITH EACH OTHER, BUT DOES NOT AND DOES NOT INTEND TO PROVIDE TRANSPORTATION SERVICES OR ACT IN ANY MANNER AS A TRANSPORTATION CARRIER, AND HAS NO RESPONSIBILITY OR LIABILITY FOR ANY TRANSPORTATION SERVICES VOLUNTARILY PROVIDED TO ANY RIDER BY ANY DRIVER USING THE LYFT PLATFORM.

….

- Such Driver will be solely responsible for any and all liability which results from or is alleged as a result of the operation of the vehicle such Driver uses to transport Riders, including, but not limited to personal injuries, death and property damages.

90.     Because Uber and Lyft disavow all responsibility for the transportation they arrange, they are simply not able to meet the burden of proving they have an interest in the maintenance, possession, or use of the vehicles their purported insurance covers.  They do not own the vehicles at issue, and claim they do not control their drivers.  Therefore, Uber and Lyft have no insurable interest (or in Uber's case Rasier has no insurable interest) in the vehicles of their third-party providers.  As a result, their insurance policies are illusory and of no effect, and

their public advertisements extolling the extent of their insurance coverage, especially in comparison to taxis, are literally false.

91.　　Defendants' misrepresentations are literally false and therefore by operation of law actually mislead consumers of vehicle-for-hire services.  As a result, Defendants are reaping the benefits of these false advertisements by improperly promoting the benefits, characteristics and types of services they provide, to the detriment of the Plaintiffs, their competitors in the transportation industry.  The misrepresentations are used repeatedly in comparisons between the Defendants and taxicabs.

### iii. *Misrepresentation #3 – Lyft's claim that it operates a "Donation" pay system.*

92.　　Lyft misrepresents its payment model as relying on donations, when, in fact, Lyft's own website refers to its suggested donation calculation method of "Lyft Pricing," denies rides to passengers who do not make donations, and automatically charges some of its fees.

93.　　First, Lyft's website indicates that, "Lyft currently collects donations in some cities and charges a set amount in others."[73]  However, by presenting the "Lyft Pricing" structure on its city pages, Lyft is misrepresenting that payment through donations is voluntary.  For example, despite representing on the Donations and Charges page that Houston is a city where donations are accepted, the Houston "Lyft Pricing" page on Lyft's website lists the costs of a Lyft ride as including a "Base Charge," "Cancel Penalty," "Cost Minimum," "Cost Per Mile," "Cost Per Minute."[74]

94.　　Lyft also misrepresents that the donations are voluntary because it automatically charges the full "suggested donation" to any riders who do not adjust the amount that appears on

---

[73] *See* "Donations vs. Charges," https://www.lyft.com/help/article/1415358.
[74] *See, e.g.,*"Lyft Houston" webpage at https://www.lyft.com/cities/houston.

384154

the app at the end of their ride within 24 hours.[75]  Thus, by requesting and accepting a ride from a Lyft driver, the passenger is actually entering an arrangement whereby Lyft mandates payment be made and requires a Lyft rider must take an affirmative action to opt out of making the "suggested donation."

95.      Furthermore, Lyft pressures passengers into making "donations" with the tacit threat that failing to make a donation may result in loss of service, and makes good on the threat for those who do not pay.  The mobile app tells users that though "donations are voluntary," users are more likely to obtain a ride if they consistently make donations.[76]  Lyft drivers can even pre-screen potential passengers by choosing to be presented with ride requests from passengers based on the frequency with which the rider "donates" the full suggested donation.  As the Court in St. Louis found, "[Lyft] drivers can choose to use a donation threshold, where they are offered only riders who 'donate' on average at or above the threshold.[77]  This was confirmed and clarified in Lyft's corporate representative deposition, when Joseph Okpaku explained how Lyft drivers set such a threshold: "if a passenger's payment history…falls underneath the threshold for a particular driver on the Lyft platform…the driver on the Lyft Platform would not see that particular request."[78]  Thus, while Lyft advertises itself as providing an "affordable ride whenever you need one" while couching its payment model as a donation-based, in fact only those passengers who consistently make the 'suggested donation' are likely to receive reliable service.[79]

---

[75] *See* Lyft Terms of Service at https://www.lyft.com/terms; *see also* St. Louis Order, page 10 at Par. 27 ("If a rider has not adjusted the donation amount within 24 hours of a ride, the rider is automatically charged the suggested donation amount").
[76] *See* St. Louis Order, page 10 at Par. 25 (noting that the Lyft application displays a message to users stating that "'[d]onations are voluntary, but drivers are more likely to accept requests from passengers who submit fair donations'").
[77] St. Louis Order, page 10 at Par. 28.
[78] Okpaku Deposition at 119:11-16.
[79] *See* http://www.lyft.com.

384154

96.     Finally, Lyft charges a cancellation fee when a rider cancels a ride request more than five minutes after a request is made.[80]   In deposition testimony, Lyft's corporate representative stated that there are times when this fee can be waived, but was unable to provide any details, criteria, or policy used by Lyft to determine whether to waive the fee.[81] Consequently, Lyft users who cancel rides after the five-minute mark are not asked to "donate" the cancellation fee, but are instead automatically charged the cancellation fee, unless some unstated (and apparently unknown) exception applies.

97.     Lyft's misrepresentations about its payments/donations are literally false and therefore by operation of law actually mislead consumers of vehicle-for-hire services.   Lyft repeatedly compares itself to taxi services and touts the fact that their methods are "taxi alternatives."  The misrepresentations are plainly designed to encourage the use its services over competitors such as the Plaintiffs, as such, Plaintiffs believe that they are and will continue to be damaged by the misrepresentations and false advertising by Lyft.

98.     Defendants' misrepresentations are literally false and therefore by operation of law actually mislead consumers of vehicle-for-hire services.  As a result, Defendants are reaping the benefits of these false advertisements by improperly promoting the benefits, characteristics and types of services they provide, to the detriment of the Plaintiffs, their competitors in the transportation industry.  The misrepresentations are used repeatedly in comparisons between the Defendants and taxicabs.

**C.     Interstate Commerce**

99.     Defendants use interstate wires, including but not limited to the use of mobile communication networks, wireless communication networks, credit card processing transactions,

---

[80] *See, e.g.,* St. Louis Order, page 10 at Par. 30.
[81] Okpaku Deposition at 20:4-12.

bank to bank payments, and transfers of funds to conduct their respective enterprises. Defendants use the Internet to falsely market their services (as described herein); use wireless and other mobile communication services to provide their services; and use smartphones, mobile communications, credit card processing transactions, bank to bank payments, and transfers of funds to receive payments from customers and provide payments to their employees and/or drivers. Defendants' actions affect interstate commerce because they solicit sales across state lines using the internet and electronic mailings, including using such devices to transmit the representations and other false statements of fact as stated herein.

## IV. Causes of Action

### A. Lanham Act - Misrepresentation of Services 15 U.S.C. § 1125(a)(1)(B)

100. Plaintiffs repeat and incorporate the paragraphs above. Defendants' false advertising, as described above, is prohibited by the Lanham Act, specifically 15 U.S.C. § 1125(a)(1)(B), which states in part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—…
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

101. As stated above, the Defendants have made false or misleading statements of fact about their products/services, many of which are literally false;[82] the statements actually deceived or had the tendency to deceive a substantial segment of their audience, including consumers who seek transportation in the form of a taxi cab operated by one of the Plaintiffs or

---

[82] *See* § III.B., *infra*.

an Uber/Lyft vehicle;[83] the deceptions are material in that they are likely to influence the consumer's purchasing decisions;[84] and the statements entered interstate commerce by way of advertising to and otherwise communicating with potential customers located in multiple states and across state lines, including but not limited to, by publishing its advertisements on the internet.[85]  As described more fully above, these misrepresentations include but are not limited to representations regarding the safety of their services and background checks, the insurance coverage applicable to their rides, and that Lyft's fees are voluntary donations.   These misrepresentations are done in direct comparison to competitors such as the Plaintiffs and appear to be purposely designed to inflict reputational harm on the Plaintiffs by attempting to promote their own products and services at the expense of the Plaintiffs.

102.   Plaintiffs believe they have been or are likely to be injured as a result of Defendants' unlawful and misrepresented descriptions of their services.  Pursuant to 15 U.S.C. § 1117(a), Plaintiffs seek a recovery of the Defendants' profits in Houston and San Antonio, as well as all costs of this action, including their reasonable and necessary attorney fees.   Should the Court determine that the amount of the recovery of the Defendants' profits is inadequate in order to compensate Plaintiffs for the Defendants' actions, the Court should enter judgment for such sum the Court shall find to be just, according to the circumstances of this case.

**B.**      **Texas Common Law Unfair Competition**

103.   Plaintiffs repeat and incorporate the paragraphs above.  Plaintiffs seek any and all damages due to the Defendants' unfair competition.

104.   Unfair competition under Texas law "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice

---

[83] *See* § III.B., *infra*.
[84] *See id.*
[85] *See* § III.C., *infra*.

in industrial or commercial matters." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir. 1974), *quoted in United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 217 (Tex. App.—Waco 1993, writ denied). Defendants have committed various anti-competitive acts as shown herein, including making false advertising claims, which have interfered with the Plaintiffs' ability to conduct their businesses. *See Schoellkopf v. Pledger,* 778 S.W.2d at 897, 904–05 (Tex. App.—Dallas 1989, writ denied). This interference has caused damage to the Plaintiffs and provided Defendants with undeserved benefits for which Plaintiffs are entitled a recovery.

## V. **Attached Evidence**

105.    Plaintiffs attach evidence to this complaint, or alternatively include same in an appendix filed herewith, and incorporate the evidence into this pleading as if fully included herein, and as referenced throughout the complaint.

## VI. **Attorneys' Fees**

106.    Plaintiffs are entitled to recover reasonable and necessary attorneys' fees that are equitable and just under 15 USC § 1125(a).

## VII. **Damages**

107.    By reason of Defendants' acts alleged herein, Plaintiffs have suffered, and will continue to suffer, damages to their businesses. Plaintiffs therefore request that the Court award as damages to the Plaintiffs, the greater of (1) the Defendants' profits, (2) any sum above these amounts not exceeding three times the amount, or (3) any higher amount as the Court may award in its discretion according to the circumstances of this case, pursuant to 15 USC § 1117(a). Plaintiffs are entitled to recover damages in the amount of the Defendants' profits earned as a result of their unfair competition and their violations of the Lanham Act. *See Amigo*

*Broadcasting, LP v. Spanish Broadcasting Sys., Inc.*, 521 F.3d 472, 493–94 (5th Cir. 2008); *see also* 15 USC § 1117(a); *Sandare Chem Co. v. WAKO Int'l*, 820 S.W.2d 21, 24 (Tex. App.-Fort Worth 1991, no writ).

## VIII.  Request for Permanent Injunction

108.    Pursuant to 15 USC § 1116(a), Plaintiffs ask the court to set their application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against Defendants enjoining them forever from the conduct described herein, or upon any other such terms as the court may deem reasonable to prevent further violations of law.  Defendants' conduct causes irreparable injury to Plaintiffs for which there is no adequate remedy at law.  Balancing the hardships and public interest factors at issue, this Court should issue a permanent injunction against Defendants to stop their actions.

## IX.  Conditions Precedent

109.    All conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

## X.  Jury Demand

110.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs asserts their right to trial by jury on all issues.

## XI.  Prayer

Plaintiffs pray that after final trial of this matter the Court enter judgment in favor of Plaintiffs, with the judgment awarding the following relief:

   a.    Actual damages as proven at trial in excess of this Court's minimum jurisdictional requirements, including but not limited to Defendants' profits, or any other amount as requested above;

   b.    Treble and Additional Damages;

   c.    Equitable relief as requested herein, including a permanent injunction;

d.      Prejudgment and post-judgment interest as allowed by law;

e.      Attorney's fees;

f.      All costs of court; and

g.      Such other and further relief to which Plaintiffs are entitled.

Dated: April 15, 2015.

Respectfully submitted,

**PAGEL, DAVIS & HILL, P.C.**


 _/s/ Michael A. Harris_____
**MARTYN B. HILL**
State Bar No. 09647460
Federal Bar No. 13806
mbh@pdhlaw.com
**Michael A. Harris**
State Bar No. 24046030
Federal Bar No. 586840
mah@pdhlaw.com
1415 Louisiana Street, 22nd Floor
Houston, Texas 77002
Telephone:      713-951-0160
Facsimile:       713-951-0662
ATTORNEYS FOR PLAINTIFFS

384154

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 15th day of April 2015, a true and correct copy of the foregoing was served upon the following via ECF transmission:

Stephen A. Swedlow
Quinn Emanuel Urquhart & Sullivan LLP
500 West Madison Street, Suite 500
Chicago, Illinois 60661
Counsel for Uber Technologies, Inc.

Barrett H. Reasoner
Gibbs & Bruns LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
Counsel for Uber Technologies, Inc.

Danny David
Paul R. Elliott
Amy Pharr Hefley
Caroline Carter
Baker Botts, LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
Counsel for Defendant Lyft Inc.

/s/ Michael A. Harris
Michael A. Harris

384154